UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC. | : | **COMPLAINT AND DEMAND FOR** |
| Plaintiff, | : | **TRIAL BY JURY** |
| -against- | : | Case No. 1:21-cv-10969 |
| BOREALIS MARITIME LIMITED, | : | |
| Defendant. | : | |

-----------------------------------------------------------------x

Plaintiff Energy Transportation Group, Inc., by its undersigned counsel, as and for its complaint against Defendant Borealis Maritime Limited, respectfully alleges as follows:

**Nature of the Action**

1.      This action is brought by Plaintiff Energy Transportation Group, Inc. ("ETG") against Defendant Borealis Maritime Limited ("Borealis") for breach of contract. Borealis has failed to pay amounts that recently have become due to ETG pursuant to the parties' written contract entitled "Revenue Sharing Agreement" (the "RSA"), which was entered into by ETG and Borealis on or about August 1, 2012.  A copy of the duly executed RSA is attached hereto as Exhibit A.

2.      The RSA provides that ETG would receive 7.5% of the "carried interest"[1] potentially to be earned by Borealis in connection with Borealis' prospective role as manager of

---

[1] In the investment/asset management business, "carried interest" is a fee payable to the investment/asset manager if certain specified performance targets are met. The carried interest formula varies among funds and managers. Generally, a carried interest is a percentage of the profits generated by the assets that the manager oversees on behalf of his investors, that is realized when a pre-established target of asset growth (known as a "hurdle rate") has been met. In other words, after the managed assets achieve an X% annualized growth rate, the manager will begin receiving performance fees calculated as Y% of the profits generated by those assets. There are many possible variations; *e.g.*, a carried interest formula may provide that as and when the rate of return to the investors grows, the manager's percentage grows as well.  But typically no carried interest is payable unless/until an initial target is met.

investment assets used in the maritime shipping industry. When the RSA was executed in 2012, Borealis was managing a relatively modest amount of such assets, but was hoping, with entrée provided by ETG, to raise substantially more capital, through one or more financings, that would be invested in shipping assets and managed by Borealis.

3. As it turned out, at least three such financings of assets to be managed by Borealis, raising approximately $400 million, did occur in the years 2013-2015, thanks to ETG's having used its relationships and reputation in the banking and shipping industries to create this opportunity for Borealis. The $400 million (at a minimum) in fresh capital that Borealis, with ETG's help, was able to raise for its investment funds was the realization of what Borealis bargained for when the RSA was created and executed by Borealis and ETG in 2012. Upon information and belief, Borealis obtained even more financing than the $400 million of which ETG is currently aware, but has not disclosed the extent of that additional financing to ETG.

4. Upon information and belief, beginning in approximately 2020 when the COVID-19 pandemic dramatically increased the value of the container ships and other maritime assets that defendant Borealis was managing, Borealis began to receive or became entitled to receive substantial payments in respect of its carried interest in the roughly $400 million (or more) in maritime assets that it acquired through financings that occurred after the execution of the RSA. However, Borealis has failed to pay ETG anything in respect of ETG's 7.5% share of these performance fees which Borealis has recently begun to realize and which are ongoing. Nor has Borealis made available to ETG certain co-investment rights to which ETG also is entitled pursuant to its contract with Borealis. Accordingly, ETG brings this action to enforce the RSA and obtain the share of Borealis' past, present, and future fees and profits to which ETG is entitled pursuant to that contract.

**Parties, Jurisdiction, and Venue**

5.  Plaintiff ETG is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

6.  Defendant Borealis is a foreign corporation that is registered in England and Wales, with its principal place of business located in London, England.

7.  This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332(a)(2), since the matter in controversy herein exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ETG, a citizen of Delaware and New York; and Borealis, a citizen of a foreign state. Venue is proper in this District pursuant to 28 U.S.C. 1391(c)(2), since Borealis has agreed to be subject to this Court's personal jurisdiction in this district with respect to this civil action. Specifically, the parties to this action agreed, in Paragraph (g) of the RSA, that "ETG and Borealis hereby irrevocably consent to the jurisdiction and venue of the courts of the state of New York and the Federal Courts of the United States of America, in each case located in New York County, in connection with any dispute arising out of or concerning this agreement." The same paragraph states that New York law (without regard to principles of conflict of law) applies to the RSA.

8.  Upon information and belief, the value of the carried interest that Borealis recently has begun to realize or become entitled to, within approximately the past two years, approaches or even exceeds $100 million. Discovery is necessary to determine the exact figures, as ETG believes that the aggregate amount of financings received by Borealis, with respect to which ETG is entitled to 7.5% of Borealis' carried interest, substantially exceeds $400 million. Since ETG is entitled to 7.5% of the amount of carried interest realized or to be realized by Borealis in respect of all post-

RSA financings, the amount in controversy in this action, exclusive of interest or costs, is at least $7.5 million and thus substantially exceeds the sum or value of $75,000.

## Statement of Facts

9. The contract at issue in this case was the product of a long relationship between ETG's Chairman, Kimball Chen, and Borealis' CEO, Christoph Toepfer, both of whom are highly sophisticated and experienced businessmen. Indeed, the business and personal relationships between the families of Messrs. Chen and Toepfer span multiple generations and continents. Their respective fathers, one Chinese and the other German, were friends and prominent participants in the post-World War II shipping industry. Each of these men groomed their sons to enter the maritime transportation business. Kimball Chen, a graduate of Harvard College in 1973 and of Harvard Business School in 1978, had been introduced over the years to various of his family's friends and colleagues in the shipping industry. Mr. Chen invested considerable energy and expertise in nurturing and developing these mutually valuable and productive relationships. In an email to a prominent Japanese shipping executive sent in May 2012, shortly before the RSA was executed, Mr. Toepfer described Mr. Chen as "a long-time family friend of ours" who had become "one of our senior advisors to Borealis."

10. The first significant business transaction in which Kimball Chen and Christoph Toepfer were mutually involved had occurred in the mid-2000's, when ETG engaged in negotiations with a major Chinese state investment company to develop a large shipping fleet. Mr. Chen created a major opportunity for Mr. Toepfer by inviting the company with which Mr. Toepfer was then affiliated to be involved in the proposed transaction, for which Mr. Toepfer expressed his gratitude to Mr. Chen.

11. The more recent genesis of the RSA began in late 2011, when Mr. Chen, who was well-connected in the maritime shipping industry, was approached by Kenneth Buckfire, an investment banker who headed the firm of Miller Buckfire & Co., LLC ("Miller Buckfire"). Mr. Chen enjoyed both a professional acquaintance and a personal friendship with Mr. Buckfire. Mr. Buckfire requested Mr. Chen to identify and introduce an experienced shipping executive who, in Mr. Chen's opinion, had the essential skills to manage the asset restructuring of a maritime shipping fleet, and also the ability to run an investment fund focused on acquiring shipping assets. This invitation to nominate the right prospective manager, which was presented to Mr. Chen because of his skills, knowledge, experience, relationships and judgment, and for which Mr. Chen would propose Mr. Toepfer and Borealis, set in motion the chain of events that led to the creation and execution of the RSA.

12. As of 2011-12, Borealis was managing approximately $50 million in shipping assets, but aspired to become a much larger asset manager. Mr. Chen leveraged his contacts and reputation, for the benefit of Borealis and Mr. Toepfer, by recommending Mr. Toepfer and his company to Mr. Buckfire as the right manager for the opportunity that Mr. Buckfire had described to Mr. Chen, and then by putting Mr. Toepfer in direct contact with Miller Buckfire. As Messrs. Chen and Toepfer anticipated, Miller Buckfire in turn introduced Borealis to a number of major institutional sources of large amounts of capital that Borealis had been unable to tap successfully before, including the leading private equity firm of Kohlberg, Kravis & Roberts ("KKR").

13. In 2012, before KKR committed its investors' capital, and in recognition of ETG's having opened doors for Borealis that Borealis had not been able to open itself, ETG and Borealis executed the RSA to memorialize the parties' agreement that ETG would be compensated for its efforts on Borealis's behalf – contingent upon Borealis achieving success by (a) actually raising

significant capital and (b) monetizing that success thereafter by realizing revenue from its carried interest in the assets purchased with that capital. Both Borealis and ETG were advised by counsel in connection with the preparation of the RSA. Pursuant to section (c) of the RSA, Borealis agreed that if it were to obtain financing, ETG would receive "a 7.5% interest in the carried interest of Borealis (or any other related Borealis entity) in investment(s) (whether equity, loans or otherwise) made with the Financing…." "Financing" was broadly defined (by reference to the definition of that term contained in a separate agreement) to encompass, *inter alia,* "any loan or other financing with one or more lenders and/or investors." In addition, Borealis agreed that if it were to invest its own funds in any such financing, ETG would be given the opportunity to co-invest 7.5% of the amount invested by Borealis in such funds, on terms identical to the terms of Borealis' investment.[2] No preconditions to ETG's entitlement to these revenues and investment opportunities, beyond the requirement that Borealis actually obtain "Financing" (as defined), exist in the parties' agreement.

14. Between 2013 and 2015, as a result of the introductions made possible by ETG's Mr. Chen through Miller Buckfire as alleged above, approximately $400 million in financing was supplied by KKR to capitalize three investment funds known as Embarcadero Maritime Funds I, II and III, respectively (the "EM Funds") to be managed by Borealis. Upon information and belief, these funds were invested in maritime shipping assets, including a substantial number of container ships. Upon information and belief, Borealis has acted as the investment manager for the EM Funds from their inception to the present day; and upon information and belief, Borealis has an entitlement to receive carried interest in consideration of its management of each of these funds – if, as and when specified performance targets are met.

---

[2] In light of the fact that the relevant provisions of the RSA explicitly encompass "any other related Borealis entity," references to "Borealis" herein, in the context of the earning of carried interest performance-related revenues, or profits from any co-investments, include any and all such related entities.

15. Upon information and belief, KKR has provided or facilitated additional financing, above and beyond this $400 million, for Borealis to invest in maritime shipping assets that Borealis would manage. Borealis has not disclosed to ETG the extent and terms of such additional financing. However, it is reasonable to believe, and ETG therefore alleges upon information and belief, that Borealis has an entitlement to carried interest in these additional funds as well, to which ETG's rights under the RSA to 7.5% of that carried interest would apply; and that Borealis was provided with co-investment rights as to which ETG's right to participate under the RSA also would apply.

16. On information and belief, prior to 2020, the financial returns achieved by the EM Funds were not high enough to generate any realizable carried interest for Borealis. In fact, in 2018, Borealis represented to ETG that the internal rates of return (annualized growth rates) of the assets in the three EM Funds remained well below the level that would generate any carried interest for Borealis and, therefore, for ETG.

17. Nonetheless, at that same time in 2018, Borealis proposed to ETG that the parties amend the RSA by renegotiating its terms to (a) lower the percentage of Borealis's hoped-for carried interest to which ETG would be entitled, from 7.5% to a smaller amount; and (b) limit the scope of the financings that would generate ETG's entitlement to its percentage share, such that ETG would be entitled to a share of the carried interest generated by the EM Funds only.[3] ETG declined to amend the RSA at that time because Mr. Toepfer represented that Borealis had not received any carried interest in respect of the EM Funds to that point, and he further stated that Borealis probably never would realize any such interest in light of then-prevailing conditions in

---

[3] As noted previously, the definition of "Financing" referred to in the RSA broadly includes "any loan or other financing with one or more lenders and/or investors."

the shipping industry; and because ETG believed that the total scope of the Borealis financings significantly exceeded the financing of the EM Funds alone.

18. Upon information and belief, Borealis recognized at that time, in 2018, that it could owe ETG a great deal of money if economic conditions affecting the shipping industry improved significantly, and/or if Borealis increased its assets under management with additional financings. Therefore, Borealis sought to limit the amounts to which it knew ETG would become entitled contractually under the RSA as it existed in 2018, and as it still exists today. Although Borealis did not disclose to ETG, at the time of the attempted renegotiation or thereafter, the extent of the additional financing above $400 million that Borealis received or anticipated receiving through KKR or other sources of funding, it is reasonable to believe, and ETG therefore alleges, that additional financing has in fact been provided to Borealis as to which ETG's contractual entitlements apply.

19. The COVID-19 pandemic that began in early 2020 catalyzed major changes and dislocations in the world economy. The vast and complex array of consequences has resulted in a dramatic increase in the value of assets used in the shipping industry. Many such assets have increased in value by multiples of their original cost. As a result, the rate of return on the assets that Borealis has been managing in the EM Funds (and on any maritime shipping assets acquired with additional funding) has increased enormously over the last approximately two years, surpassing (on information and belief) Borealis' "hurdle rate" and triggering an entitlement by Borealis to carried interest payments with respect to the EM Funds and on any maritime shipping assets acquired with additional financing. On information and belief, Borealis recently has received, or has become entitled to receive such payments; and ETG is entitled to 7.5% of these amounts pursuant to the RSA. On information and belief, the amount of carried interest that

Borealis has received or become entitled to receive within approximately the last two years in connection with the EM Funds alone approaches or exceeds $100 million.

20. Despite the fact that ETG has a clear contractual entitlement, pursuant to the terms of the RSA, to 7.5% of the carried interest that Borealis has realized since its performance exceeded its relevant hurdle rates, Borealis has failed to make any such payments due to ETG pursuant to the RSA.

21. Despite the fact that, upon information and belief, Borealis has invested its own money in one or more of these investment funds, Borealis has not provided ETG with the opportunity to co-invest 7.5% of the amount invested by Borealis on the same terms and conditions, as mandated by the RSA.

22. Upon information and belief, KKR has provided additional financing to Borealis, beyond the $400 million in the EM Funds, as to which Borealis is similarly entitled to receive carried interest as and when the performance targets applicable to those financings are met; and as to which Borealis has invested its own money. Discovery will disclose the extent and terms of these additional financings. To the extent such financings in fact occurred at any time after the execution of the RSA in 2012, ETG is entitled to 7.5% of the fees in respect of Borealis' carried interest to which Borealis is now entitled or may become entitled in the future, as well as the profits to which it would have been entitled pursuant to its co-investment rights.

**First Cause of Action**
**Breach of Contract**

23. Plaintiff repeats and realleges Paragraphs 1 through 22 as though fully set forth herein.

24. By failing to pay ETG 7.5% of the performance fees which it has received or is entitled to receive as alleged hereinabove, Borealis has committed a breach of the RSA.

25. By failing to provide ETG with the 7.5% co-investment opportunity in respect of all amounts invested in the subject financings by Borealis, Borealis has committed a further breach of the RSA.

26. By reason of the foregoing, and based upon ETG's understanding that Borealis' carried interest in the EM Funds alone is in the approximate range of $100 million, ETG has sustained damages of at least approximately $7.5 million. The precise amount of these damages will be quantifiable when discovery reveals (a) the amount of carried interest that Borealis has earned to date with respect to investments made with financings occurring on or after the date the RSA was executed; (b) the amount of its own funds that Borealis invested in such assets and the profits earned on such investments to date; and (c) the amounts of the foregoing categories of revenue or appreciation that can reasonably be estimated to be realizable in the future.

## Second Cause of Action
## Breach of the Implied Covenant of Good Faith and Fair Dealing

27. Plaintiff repeats and realleges Paragraphs 1 through 26 as though fully set forth herein.

28. The RSA, like all contracts, is accompanied by an implied covenant of good faith and fair dealing on the part of both parties thereto, pursuant to which each party covenants to the other that it will not take any steps to deprive the other of the full fruits and benefits of their agreement.

29. By failing to disclose to ETG (a) the full extent of the financings it obtained following the execution of the RSA in 2012; (b) the realization of its carried interest as and when Borealis became entitled to receive such performance fees in respect of the investment assets purchased with such financings; and (c) the existence and amounts of investments by Borealis in the subject financings (and in conjunction therewith by failing to offer ETG the opportunity to co-

invest alongside Borealis), Borealis violated the implied covenant of good faith and fair dealing appurtenant to the RSA.

30. Upon information and belief, Borealis has taken steps to alter its corporate structure and/or to modify its fee arrangements for the EM Funds and/or other post-RSA financings, in a manner designed to deprive ETG of some or all of the amount to which ETG is entitled or would otherwise have become entitled pursuant to the RSA. Upon information and belief, Borealis has also made changes to its structure and the ownership of its assets with the intention and effect of making it more difficult for a creditor or plaintiff (such as ETG under the RSA) to access assets that Borealis owns, has earned or will earn, or *de facto* controls.

31. Upon information and belief, by making modifications to its corporate structure, to its asset holdings, and/or to its fee arrangements to the disadvantage of ETG, Borealis has violated the implied covenant of good faith and fair dealing appurtenant to the RSA.

32. By reason of the foregoing, ETG has suffered damages, the precise amount to be determined in discovery and/or proven at trial, representing the diminution in the apparent value of its 7.5% share of Borealis' carried interest performance fees and of ETG's 7.5% co-investment rights.

## Demand for Trial by Jury

Plaintiff demands trial by jury on all claims.

## Prayer for Relief

WHEREFORE, Plaintiff Energy Transportation Group, Inc. demands judgment against Defendant Borealis Maritime Limited, as follows:

A. Pursuant to the First Cause of Action, for damages in an amount to be determined in discovery and proven at trial, currently estimated to be at least $7.5 million;

B.  Pursuant to the Second Cause of Action, for damages in an amount to be determined in discovery and proven at trial;

C.  For prejudgment and post-judgment interest, at the applicable statutory rate(s), including 9% prejudgment interest from the dates of defendant's breaches of contract pursuant to New York CPLR §§ 5001(a) and 5004;

D.  For its costs of this action; and

E.  For such other and further relief as the Court may deem just and proper.

Dated: New York, New York
December 21, 2021

LLOYD S. CLAREMAN

By:  /s/ Lloyd S. Clareman
121 East 61st Street, 2nd Floor
New York, NY 10065
Tel. No. (212) 751-1585
Lloyd.Clareman@clareman.com

Attorney for Plaintiff
Energy Transportation Group, Inc.