UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC. | : | **AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY** |
| Plaintiff, | : | |
| -against- | : | Case No. 1:21-cv-10969-AT |
| BOREALIS MARITIME LIMITED, | : | |
| Defendant. | : | |

-----------------------------------------------------------------x

Plaintiff Energy Transportation Group, Inc., by its undersigned counsel, as and for its amended complaint against Defendant Borealis Maritime Limited, respectfully alleges as follows:

**Nature of the Action**

1. This action is brought by Plaintiff Energy Transportation Group, Inc. ("ETG") against Defendant Borealis Maritime Limited ("Borealis") for breach of contract, seeking money damages and declaratory relief in connection therewith. Borealis has failed to pay amounts that have become due to ETG pursuant to the parties' written contract entitled "Revenue Sharing Agreement" (the "RSA"), which was entered into by ETG and Borealis on or about August 1, 2012. Borealis has also informed ETG that it will refuse to make payments to ETG that will become due in the near future. A copy of the duly executed RSA is attached hereto as Exhibit A.

2. The RSA provides that ETG is entitled to receive 7.5% of the "carried interest" potentially to be earned by Borealis[1] in connection with Borealis' prospective role as manager of investment assets used in the maritime shipping industry. "Carried interest," as used in the RSA,

---

[1] The RSA provides that Borealis' obligations run to "any related Borealis entity" as well. Accordingly, the term "Borealis," as used herein, applies to all persons or entities that are related to Borealis. As described below, numerous such entities, including Swiss Trusts and a Hong Kong "advisory" corporation, are alleged to exist.

means the economic benefits, including performance-related remuneration, to be realized by Borealis (and/or its related entities), excepting only so-called "management fees" which are relatively smaller amounts designed to reimburse an investment manager for its operational costs and overhead. When the RSA was executed in 2012, Borealis was managing a relatively modest amount of such assets, but was hoping, with entrée provided by ETG, to raise substantially more capital, through one or more financings, that would be invested in shipping assets and managed by Borealis.

3. As it turned out, at least three such financings of assets to be managed by Borealis, raising approximately $400 million, did occur in the years 2013-2015, thanks to ETG's having used its relationships and reputation in the banking and shipping industries to create this opportunity for Borealis. The $400 million (at a minimum) in fresh capital that Borealis, with ETG's help, was able to raise for its managed investment funds was the realization of what Borealis bargained for when the RSA was created and executed by Borealis and ETG in 2012. Upon information and belief, Borealis obtained even more financing than the $400 million of which ETG is currently aware. However, Borealis has not disclosed the extent of that additional financing to ETG.

4. Beginning in approximately 2020, the COVID-19 pandemic dramatically increased the value of maritime assets, including the containerships and other maritime assets that defendant Borealis was managing. For example, it was publicly reported in May 2021 that Borealis sold an older containership, after only two years of ownership, for a profit in excess of 300%. It was also publicly reported that Borealis sold 12 of its managed ships for $233.9 million in June of 2021, and another 10 ships for $203.5 million in July – a total in excess of $400 million. Borealis' CEO stated to an industry publication, *Tradewinds,* in June 2021 that the timing was right and that

"selling is part of a successful investment." These sales represent only a minority portion of the investment assets that were acquired with the financings that ETG made possible, since Borealis continues to manage scores of vessels. Accordingly these asset sales should have generated substantial "carried interest" (*i.e.,* economic benefits, however denominated, apart from reimbursement for reasonable operational expenses) for Borealis and/or its related entities, as to which ETG is entitled to its 7.5% share pursuant to the RSA. However, Borealis has failed to pay ETG any portion of its economic gains or distributions which Borealis must have realized, in some form, by now.

5.  In this regard, it appears that Borealis has structured its remuneration arrangements with its investment funds in a highly complex way that circumvents and frustrates ETG's entitlement to "carried interest." Specifically, the LLC Agreements governing several of the funds that Borealis manages avoid use of the term "carried interest" in favor of different, opaque terms, including, among many others, "assumed liquidation distributions," "promote proceeds," "distributable proceeds," "advisory interest," "management company interest" and an "option agreement," any one of which could be the vehicle for the payment of economic benefits to Borealis and its related entities, above and beyond reimbursement for management expenses, that would be equivalent to "carried interest."

6.  In addition, the same LLC Agreements provide for the establishment of Borealis-related entities that are provided with economic benefits, directly or indirectly, by the investment funds at issue, include a Hong Kong company called Maritime Investment Advisors Limited. These entities are parties to separate agreements for "advisory" and other services that similarly could be vehicles for the payment of economic benefits equivalent to "carried interest."

3

7. The economic reality of the use of myriad cash flows and entities in connection with its stewardship of the maritime assets purchased with the financings that are subject to the RSA is that Borealis has avoided denominating a substantial portion of its economic benefits as "carried interest," thereby frustrating the reasonable expectations of ETG when the RSA was executed and, as a result, violating Borealis' covenant of good faith and fair dealing with ETG.

8. Borealis further has informed ETG that it refuses and/or will refuse to pay ETG its 7.5% share of Borealis' economic gains with respect to most of the assets that Borealis manages and acquired with financing proceeds that are subject to the RSA, based on an unreasonably narrow interpretation of the scope of the RSA. Borealis' current purported interpretation of that scope conflicts with the plain language of the RSA, and also contradicts the interpretation that Borealis itself adopted several years ago when it sought to amend the RSA in ways that would have disadvantaged ETG.

9. Borealis also has failed to make available to ETG certain co-investment rights to which ETG is entitled pursuant to the RSA.

10. Accordingly, ETG brings this action to enforce the RSA and obtain the share of Borealis' past, present, and future remuneration to which ETG is entitled pursuant to that contract. ETG also seeks declaratory relief, pursuant to 28 U.S.C. §§2201-02, confirming ETG's entitlement to its 7.5% share of remuneration from all of Borealis' post-RSA financings, consistent with the language of the RSA and contrary to the limited, erroneous construction of the scope of the RSA that has been advanced by Borealis.

**Parties, Jurisdiction, and Venue**

11. Plaintiff ETG is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

12. Defendant Borealis is a foreign corporation that is incorporated under the laws of England and Wales, with its principal place of business located in London, England.

13. This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332(a)(2), since the matter in controversy herein exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ETG, a citizen of Delaware and New York; and Borealis, a citizen of a foreign state. Venue is proper in this District pursuant to 28 U.S.C. 1391(c)(2), since Borealis has agreed to be subject to this Court's personal jurisdiction in this district with respect to this civil action. Specifically, the parties to this action agreed, in Paragraph (g) of the RSA, that "ETG and Borealis hereby irrevocably consent to the jurisdiction and venue of the courts of the state of New York and the Federal Courts of the United States of America, in each case located in New York County, in connection with any dispute arising out of or concerning this agreement." The same paragraph states that New York law (without regard to principles of conflict of law) applies to the RSA.

14. Upon information and belief, the value of the economic gain that Borealis has recently begun to realize and/or has or will soon become entitled to, approaches or even exceeds $100 million. Discovery is necessary to determine the exact figures, as ETG believes that the aggregate amount of financings obtained by Borealis, with respect to which ETG is entitled to 7.5% of Borealis' carried interest (however denominated), substantially exceeds $400 million, and may be twice that amount. Since ETG is entitled to 7.5% of the amount of economic gain realized or to be realized by Borealis in respect of all post-RSA financings, the amount in controversy in this action, exclusive of interest or costs, is at least $7.5 million and thus substantially exceeds the sum or value of $75,000.

**Statement of Facts**

15. The contract at issue in this case was the product of a long relationship between ETG's Chairman, Kimball Chen, and Borealis' CEO, Christoph Toepfer, both of whom are highly sophisticated and experienced businessmen. Indeed, the business and personal relationships between the families of Messrs. Chen and Toepfer span multiple generations and continents. Their respective fathers, one Chinese and the other German, were friends and prominent participants in the post-World War II shipping industry. Each of these men groomed their sons to enter the maritime transportation business. Kimball Chen, a graduate of Harvard College in 1973 and of Harvard Business School in 1978, had been introduced over the years to various of his family's friends and colleagues in the shipping industry. Mr. Chen invested considerable energy and expertise in nurturing and developing these mutually valuable and productive relationships. In an email to a prominent Japanese shipping executive sent in May 2012, shortly before the RSA was executed, Mr. Toepfer described Mr. Chen as "a long-time family friend of ours" who had become "one of our senior advisors to Borealis."

16. The first significant business transaction in which Kimball Chen and Christoph Toepfer were mutually involved had occurred in the mid-2000's, when ETG engaged in negotiations with a major Chinese state investment company to develop a large shipping fleet. Mr. Chen created a major opportunity for Mr. Toepfer by inviting the company with which Mr. Toepfer was then affiliated to be involved in the proposed transaction, for which Mr. Toepfer expressed his gratitude to Mr. Chen.

17. The more recent genesis of the RSA began in late 2011, when Mr. Chen, who was well-connected in the maritime shipping industry, was approached by Kenneth Buckfire, an investment banker who headed the firm of Miller Buckfire & Co., LLC ("Miller Buckfire"). Mr.

Chen enjoyed both a professional acquaintance and a personal friendship with Mr. Buckfire. Mr. Buckfire requested Mr. Chen to identify and introduce an experienced shipping executive who, in Mr. Chen's opinion, had the essential skills to manage the asset restructuring of a maritime shipping fleet, and also the ability to run an investment fund focused on acquiring shipping assets. This invitation to nominate the right prospective manager, which was presented to Mr. Chen because of his skills, knowledge, experience, relationships and judgment, and for which Mr. Chen would propose Mr. Toepfer and Borealis, set in motion the chain of events that led to the creation and execution of the RSA.

18.     As of 2011-12, Borealis was managing approximately $50 million in shipping assets, but aspired to become a much larger asset manager. Mr. Chen leveraged his contacts and reputation, for the benefit of Borealis and Mr. Toepfer, by recommending Mr. Toepfer and his company to Mr. Buckfire as the right manager for the opportunity that Mr. Buckfire had described to Mr. Chen, and then by putting Mr. Toepfer in direct contact with Miller Buckfire. As Messrs. Chen and Toepfer anticipated, Miller Buckfire in turn introduced Borealis to a number of major institutional sources of large amounts of capital that Borealis had been unable to tap successfully before, including the leading private equity firm of Kohlberg, Kravis & Roberts ("KKR").

19.     In 2012, before KKR committed its investors' capital, and in recognition of ETG's having opened doors for Borealis that Borealis had not been able to open itself, ETG and Borealis executed the RSA to memorialize the parties' agreement that ETG would be compensated for its efforts on Borealis' behalf – contingent upon Borealis achieving success by (a) actually raising significant capital and (b) generating economic benefit for itself from its carried interest (however denominated) in the assets purchased with that capital. Both Borealis and ETG were advised by counsel in connection with the preparation of the RSA. Pursuant to section (c) of the RSA, Borealis

agreed that if it were to obtain financing, ETG would receive "a 7.5% interest in the carried interest of Borealis (or any other related Borealis entity) in investment(s) (whether equity, loans or otherwise) made with the Financing…." "Financing" was broadly defined (by reference to the definition of that term contained in a separate agreement) to encompass, *inter alia,* "any loan or other financing with one or more lenders and/or investors." In addition, Borealis agreed that if it were to invest its own funds in any such financing, ETG would be given the opportunity to co-invest 7.5% of the amount invested by Borealis in such funds, on terms identical to the terms of Borealis' investment.[2] No preconditions to ETG's entitlement to these revenues and investment opportunities, beyond the requirement that Borealis actually obtain "Financing" (as defined), exist in the parties' agreement.

20.     Between 2013 and 2015, as a result of the introductions made possible by ETG's Mr. Chen through Miller Buckfire as alleged above, approximately $400 million in financing was supplied by KKR to capitalize three investment funds known as Embarcadero Maritime Funds I, II and III, respectively (the "EM Funds") to be managed by Borealis. These funds were invested in maritime shipping assets, including a substantial number of containerships. Upon information and belief, Borealis has acted as the investment manager for the EM Funds from their inception to the present day; and upon information and belief, Borealis has an entitlement to receive carried interest, or otherwise-denominated economic gain, in consideration of its management of each of these funds.

21.     Borealis structured its arrangements for remuneration from the EM Funds in a manner that avoids use of the term "carried interest" and, instead, provides for the economic

---

[2] As noted previously, the relevant provisions of the RSA explicitly encompass "any other related Borealis entity." Thus, references to "Borealis" herein, in the context of the earning of carried interest or other economic benefit besides overhead and expense reimbursement, or profits from any co-investments, include any and all such related entities.

equivalent thereof under a variety of other labels, and through a myriad of agreements entered into between the EM Funds and other Borealis-related entities. Upon information and belief, these labels and contractual structures had the intent, on Borealis' part, and the effect, of depriving ETG of the reasonably-anticipated fruits of the RSA, in violation of parties' covenant of good faith and fair dealing.

22. Upon information and belief, KKR has provided or facilitated additional financing, above and beyond this $400 million, for Borealis to invest in maritime shipping assets that Borealis would manage. Borealis has not disclosed to ETG the extent and terms of such additional financing. However, it is reasonable to believe, and ETG therefore alleges upon information and belief, that Borealis has an entitlement to carried interest or otherwise-denominated economic gain, in these additional funds as well, to which ETG's rights under the RSA to 7.5% of that carried interest or other economic gain would apply; and that Borealis was provided with co-investment rights as to which ETG's right to participate under the RSA also would apply.

23. In 2018, Borealis represented to ETG that the internal rates of return (annualized growth rates) of the assets in the three EM Funds remained well below the level that would generate value for Borealis and, therefore, for ETG. However, at that same time in 2018, Borealis proposed to ETG that the parties amend the RSA by renegotiating its terms to (a) lower the percentage of Borealis' "carried interest" to which ETG would be entitled, from 7.5% to a smaller amount; and (b) limit the scope of the financings that would be subject to ETG's entitlement to its percentage share, such that ETG would be entitled to a share of the carried interest generated by the three EM Funds only.[3]

---

[3] As noted previously, the definition of "Financing" referred to in the RSA broadly includes "any loan or other financing with one or more lenders and/or investors."

24. Despite the fact that Borealis proposed an amendment to the RSA that would have limited its scope to "only" the three EM Funds, Borealis has recently asserted to ETG, through counsel, that the RSA now should be (mis)interpreted to include only the first EM fund.

25. ETG declined to amend the RSA in the manner proposed by Borealis because Mr. Toepfer represented that Borealis had not received any carried interest or other economic gain in respect of the EM Funds to that point, and he further stated that Borealis probably never would realize any such interest in light of then-prevailing conditions in the shipping industry; and because ETG believed that the total scope of the Borealis financings significantly exceeded the financing of the EM Funds alone.

26. Upon information and belief, Borealis recognized at that time, in 2018, that it could owe ETG a great deal of money if economic conditions affecting the shipping industry improved significantly, and/or if Borealis increased its assets under management with additional financings. Therefore, Borealis sought to limit the amounts to which it knew ETG would become entitled contractually under the RSA as it existed in 2018, and as it still exists today.  Although Borealis did not disclose to ETG, at the time of the attempted renegotiation or thereafter, the extent of the additional financing above $400 million that Borealis received or anticipated receiving through KKR or other sources of funding, it is reasonable to believe, and ETG therefore alleges, that additional financing has in fact been provided to Borealis as to which ETG's contractual entitlements apply.  In fact, a recent biographical description of Mr. Toepfer suggests that the total amount of KKR-related financing that Borealis has received, after the execution of the RSA, is in excess of $800 million.

27. The COVID-19 pandemic that began in early 2020 catalyzed major changes and dislocations in the world economy. The vast and complex array of consequences has resulted in a

dramatic increase in the value of assets used in the shipping industry. Many such assets have increased in value by multiples of their original cost. As a result, the rate of return on the assets that Borealis has been managing in the EM Funds (and on any maritime shipping assets acquired with additional funding) has increased enormously over the last approximately two years, triggering an entitlement by Borealis to carried interest payments (however denominated in Borealis' post-RSA agreements and arrangements with its financing sources) with respect to the EM Funds and on any maritime shipping assets acquired with additional financing. On information and belief, Borealis recently has received, has become entitled to receive, and/or will soon receive such payments or their economic equivalents, however those may be labeled; and ETG is entitled to 7.5% of these amounts pursuant to the RSA. On information and belief, the amount of such economic benefits that Borealis has received or become entitled to receive since the onset of the pandemic, in connection with the EM Funds alone, approaches or exceeds $100 million.

28.     Despite the fact that ETG has a clear contractual entitlement, pursuant to the terms of the RSA, to 7.5% of economic gains, however denominated, that Borealis (or its related entities) has realized or will soon realize, Borealis has failed to make any such payments due to ETG pursuant to the RSA. Moreover, Borealis has informed ETG that it will make no payments to ETG pursuant to the RSA with respect to any investment assets other than the first EM Fund – even though Borealis previously sought to "limit" ETG's entitlement to just the first *three* EM Funds.

29.     Despite the fact that, upon information and belief, Borealis has invested its own money or other assets in one or more of these investment funds, Borealis has not provided ETG with the opportunity to co-invest 7.5% of the amount invested by Borealis on the same terms and conditions, as mandated by the RSA.

30. Upon information and belief, KKR has provided additional financing to Borealis, beyond the $400 million in the EM Funds, as to which ETG is similarly entitled to receive its 7.5% share of economic benefits, however they may be labeled or structured; and as to which Borealis has invested its own money. Discovery will disclose the extent and terms of these additional financings. To the extent such financings in fact occurred at any time after the execution of the RSA in 2012, ETG is entitled to 7.5% of Borealis' economic benefits, however labeled or structured, to which Borealis is now entitled or may become entitled in the future, as well as the profits to which it would have been entitled pursuant to its co-investment rights.

31. On information and belief, Borealis has taken numerous steps to frustrate ETG's entitlement to the anticipated fruits of the RSA, and has thereby breached the covenant of good faith and fair dealing appurtenant to the RSA and to every contract. On information and belief, these steps include, without limitation:

   a. Arranging with KKR to receive substantial economic benefits that are denominated as something other than "carried interest," or that are structured with Borealis-related entities, including a Hong Kong corporation called Maritime Investment Advisors, Limited, pursuant to a variety of "advisory" or similar contracts, thereby frustrating ETG's entitlement;

   b. Making changes to its remuneration arrangements with KKR without notifying ETG, as required by the RSA;

   c. Creating two Swiss Trusts, called the "Didi Trust" and the "Bark Trust," to receive a portion of the carried interest or otherwise-denominated economic gains that would otherwise have been paid to Borealis;

  d. Retreating from its prior, documented position that ETG should be entitled to be compensated pursuant to the RSA at least in respect of all three of the EM Funds; and

  e. Failing to advise ETG of co-investment opportunities to which ETG was entitled under the RSA, as those opportunities arose.

  32. An actual controversy between Borealis and ETG currently exists regarding the scope of the RSA, which this Court can and should resolve pursuant to 28 U.S.C. 2201, by declaring that ETG's compensation rights under the RSA extend to all "Financings," as broadly defined in the RSA, that provided investment funds which Borealis used to purchase and manage maritime assets after the execution of the RSA. In addition, once discovery has made available to ETG the full details of Borealis' highly complex remuneration arrangements with its investment funds, the Court can and should resolve, pursuant to 28 U.S.C. 2201, the scope of the various earning streams received by Borealis and its related entities that are subject to ETG's 7.5% interest as provided in the RSA.

**First Cause of Action**
**Breach of Contract**

  33. Plaintiff repeats and realleges Paragraphs 1 through 32 as though fully set forth herein.

  34. By failing to pay ETG 7.5% of the remuneration which it has received or is entitled to receive as alleged hereinabove, Borealis has committed a breach of the RSA.

  35. By failing to provide ETG with the 7.5% co-investment opportunity in respect of all amounts invested by Borealis, Borealis has committed a further breach of the RSA.

  36. Borealis has breached its contract with ETG by engaging in numerous acts that constitute a breach of the covenant of good faith and fair dealing, as described hereinabove.

37. By reason of the foregoing, and based upon ETG's understanding that Borealis' carried interest, however labeled, in the EM Funds alone is in the approximate range of $100 million, ETG has sustained damages of at least approximately $7.5 million. The precise amount of these damages will be quantifiable when discovery reveals (a) the amount of economic benefits, however labeled or structured (exclusive of management fees) that Borealis has obtained to date with respect to investments made with financings occurring on or after the date the RSA was executed; (b) the amount of its own funds that Borealis invested in such assets and the economic benefits earned on such investments to date; and (c) the amounts of the foregoing categories of revenue or benefits that can reasonably be estimated to be realizable in the future.

**Demand for Trial by Jury**

Plaintiff demands trial by jury on all claims.

**Prayer for Relief**

WHEREFORE, Plaintiff Energy Transportation Group, Inc. demands judgment against Defendant Borealis Maritime Limited, as follows:

A. Pursuant to the First Cause of Action, for damages in an amount to be determined in discovery and proven at trial, currently estimated to be at least $7.5 million;

B. Pursuant to the First Cause of Action, for declaratory relief in the form of a declaratory judgment pursuant to 28 U.S.C. §2201-02: (i) finding that the RSA applies to all "financings" after the execution of the RSA (including but not limited to all three EM Funds), that resulted in investment funds being raised for the purpose of purchasing maritime assets to be managed by Borealis or its related parties; and (ii) adjudicating the scope of ETG's entitlement to the various revenue streams that Borealis has structured, as alleged hereinabove, in connection with these various financings;

C.  For prejudgment and post-judgment interest, at the applicable statutory rate(s), including 9% prejudgment interest from the dates of defendant's breaches of contract pursuant to New York CPLR §§ 5001(a) and 5004;

D.  For its costs of this action; and

E.  For such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       March 4, 2022

                        LLOYD S. CLAREMAN

                        By: /s/ Lloyd S. Clareman
                        121 East 61st Street, 2nd Floor
                        New York, NY 10065
                        Tel. No. (212) 751-1585
                        Lloyd.Clareman@clareman.com

                        Attorney for Plaintiff
                        Energy Transportation Group, Inc.