```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/20/2023__
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------
ENERGY TRANSPORTATION GROUP, INC.,

                Plaintiff,

-against-

BOREALIS MARITIME LIMITED,

                Defendant.
-------------------------------------------------------------

21 Civ. 10969 (AT)

**ORDER**

ANALISA TORRES, District Judge:

    Plaintiff, Energy Transportation Group, Inc. ("ETG"), brings this action against Defendant, Borealis Maritime Limited ("Borealis"), alleging breach of contract and seeking money damages and a declaratory judgment. Am. Compl. ¶¶ 1, 33–37, ECF No. 13. Borealis moves to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 22; *see also* Def. Mem., ECF No. 23. For the reasons stated below, Borealis' motion is DENIED.

## BACKGROUND[1]

    In late 2011, Kenneth Buckfire, an investment banker with Miller Buckfire & Co., LLC ("Miller Buckfire"), approached Kimball Chen, the chairman of ETG, and requested that Chen introduce him to an experienced shipping executive with the skills to manage the asset restructuring of a maritime shipping fleet and the ability to run an investment fund focused on acquiring shipping assets. Am. Compl. ¶¶ 15, 17. Chen introduced Buckfire to Christoph Toepfer, the CEO of Borealis. *Id.* ¶¶ 15, 17–18. At the time, Borealis was managing approximately $50 million in shipping assets. *Id.* ¶ 18. Miller Buckfire subsequently introduced

---

[1] The following facts are taken from the complaint and "are presumed to be true for purposes of considering a motion to dismiss for failure to state a claim." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 398 (2d Cir. 2015).

Borealis to several entities with large amounts of capital, including the private equity firm Kohlberg, Kravis & Roberts ("KKR"). *Id.*

On August 1, 2012, ETG and Borealis entered into a revenue sharing agreement (the "RSA") that entitles ETG to 7.5% of the "carried interest" to be earned by Borealis or related entities derived from investments made with financing from lenders or investors, contingent upon Borealis raising significant capital and generating carried interest derived from assets purchased with that capital. *Id.* ¶¶ 1–2, 19 & n.1. "Carried interest" refers to the economic benefits, including performance-related remuneration, realized by Borealis and related entities, excluding management fees designed to reimburse Borealis for operational and overhead costs. *Id.* ¶ 2. The RSA also entitles ETG to the opportunity to co-invest 7.5% of the amount invested by Borealis in the event Borealis invested its own funds, subject to the same terms as Borealis' investment. *Id.* ¶¶ 19, 29.

Between 2013 and 2015, KKR supplied approximately $400 million in financing to Borealis to manage three investment funds, Embarcadero Maritime Funds I, II, and III (the "EM Funds"). *Id.* ¶¶ 3, 20. The funds were invested in maritime shipping assets, including a substantial number of containerships. *Id.* ¶ 20. Borealis has acted as the investment manager for the EM Funds since their inception and has an entitlement to receive carried interest in consideration of its management of these funds. *Id.* Borealis and its related entities have purposefully structured their remuneration arrangements with respect to the EM Funds in order to avoid the term "carried interest," and provide the economic equivalent thereof under terms such as "assumed liquidation distributions," "promote proceeds," "distributable proceeds," "advisory interest," "management company interest," or "option agreement," depriving ETG of the fruits of the RSA. *Id.* ¶¶ 5–7, 21.

In 2018, Borealis represented to ETG that it had not received any carried interest from investments made using the EM Funds. *Id.* ¶ 23. At the same time, Borealis proposed to ETG an amendment to the RSA that would lower the percentage of Borealis' carried interest to which ETG would be entitled and limit the scope of financings subject to the RSA to the EM Funds only. *Id.* ETG declined to amend the RSA. *Id.* ¶ 25.

In 2020, the COVID-19 pandemic increased the value of maritime assets. *Id.* ¶¶ 4, 27. Borealis has received, become entitled to receive, and will soon receive carried interest payments with respect to the EM Funds, as well as other assets acquired with additional financing, totaling approximately $100 million. *Id.* ¶ 27. In May 2021, Borealis sold a containership for a profit in excess of 300%. *Id.* ¶ 4. In June 2021, Borealis sold twelve of its managed ships for $233.9 million. *Id.* In July 2021, Borealis sold another ten ships for $203.5 million. *Id.* These investment asset sales generated substantial carried interest. *Id.*

Since 2015, KKR has provided or facilitated approximately $400 million in additional financing for Borealis to invest in maritime shipping assets for Borealis to manage, but Borealis has not disclosed the extent or terms of this additional financing. *Id.* ¶¶ 22, 26. These additional funds have generated or will also generate carried interest. *Id.* ¶ 22.

Borealis has also invested its own money in one or more of the EM Funds but has not provided ETG with the opportunity to co-invest 7.5% of the amount invested by Borealis, as mandated by the RSA. *Id.* ¶¶ 9, 29. And, Borealis has made changes to its remuneration arrangements with KKR without notifying ETG, as required by the RSA. *Id.* ¶ 31(b).

Borealis has recently stated to ETG that it interprets the RSA to include only Embarcadero Maritime Funds I ("EM I"). *Id.* ¶¶ 24, 28. Borealis has failed to make any payments to ETG under the RSA. *Id.* ¶¶ 4, 28. Borealis has further frustrated ETG's entitlement

to 7.5% of Borealis' carried interest by creating two Swiss trusts to receive a portion of the carried interest that would otherwise be paid to Borealis.  *Id.* ¶ 31(c).

On December 21, 2021, ETG filed suit against Borealis to recover 7.5% of Borealis' carried interest generated from post-RSA financings and the profits to which ETG would have been entitled pursuant to its co-investment rights, and seeking a declaratory judgment regarding which earning streams received by Borealis and its related entities are subject to the RSA.  ECF No. 1; Am. Compl. ¶¶ 10, 30, 32.  ETG alleges that Borealis has breached the RSA by failing to pay ETG 7.5% of remuneration it has received, failing to provide ETG with co-investment opportunities, and breaching the covenant of good faith and fair dealing by frustrating ETG's rights under the RSA.  Am. Compl. ¶¶ 34–36.  ETG amended its complaint on March 4, 2022.  Am. Compl.  On May 3, 2022, Borealis moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6).  ECF No. 22.

## DISCUSSION

I.  Motion to Dismiss

A.  Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level."  *Id.*  The Court must accept the allegations in the pleadings as true and draw all reasonable

inferences in favor of the non-movant. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

    B. Analysis

First, Borealis argues that ETG's amended complaint should be dismissed because ETG's interpretation of the RSA is unreasonable on its face and contrary to the terms of the RSA. Def. Mem. at 2, 11. Borealis contends that the RSA unambiguously limits the scope of ETG's entitlement to 7.5% of Borealis' carried interest in investments made with financings in which Miller Buckfire was involved, which only includes EM I. Def. Mem. at 12. Borealis argues that ETG's interpretation of the RSA requires Borealis to pay ETG a percentage of its profit from any new investment funds *ad infinitum*, whether or not ETG played any role in assisting Borealis in acquiring those funds, which is patently unreasonable. *Id.* at 16.

The terms of the RSA are not unambiguous.[2] The RSA states: "In the event [that] Borealis obtains [f]inancing (as defined in the [CRA]), Borealis will grant ETG (i) a 7.5% interest in the carried interest of Borealis (or any other related Borealis entity) in investment(s) (whether equity, loans or otherwise) made with the [f]inancing[.]" RSA at 1, ECF No. 13-1.[3] The CRA defines financing as "an issuance, sale[,] or placement, through a rights offer or

---

[2] The Court shall consider the RSA, as well as the capital raising agreement (the "CRA") between Miller Buckfire and Borealis, because both documents are attached to the complaint. *See* Fed. R. Civ. P. 10(c); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see also* ECF No. 13-1. The Court shall not consider the letter from Miller Buckfire to Borealis terminating the CRA, ECF No. 24-3, because it was not attached to or referenced in the complaint and ETG did not rely on it in drafting the complaint, *see* Pl. Opp. at 3–4, 14–15, ECF No. 25. Borealis argues that the termination letter is an amendment to the CRA and therefore integral to the complaint. Def. Mem. at 7 & n.3; Def. Reply at 1 n.2, ECF No. 27. But, a termination is not an amendment. Further, ETG is not a party to the CRA and there is no evidence that ETG knew of the termination letter at the time it filed its original complaint or relied on the letter in amending its complaint such that the letter is integral to the amended complaint. *See* Pl. Opp. at 3–4, 14–15; Def. Mem. at 18; Def. Reply at 1 n.2. Indeed, Borealis contends that the intent of the RSA "can be assessed by the Court without any reference to the [t]ermination [l]etter at all." Def. Reply at 1. The termination letter is, therefore, not integral to the complaint. *See Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 269 (S.D.N.Y. 2005).
[3] ECF No. 13-1 contains both the RSA at pages 2–3 and the CRA at pages 4–9. The Court uses the pagination contained in each individual document, *i.e.*, refers to page 1 of the RSA rather than page 1 of ECF No. 13-1.

5

otherwise, of the equity, equity-linked or debt securities, instruments or obligations of [Borealis] or any loan or other financing with one or more lenders and/or investors[.]" CRA at 2, ECF No. 13-1. It is not clear, on the face of the RSA, that the parties intended "financing" to mean only that financing which was obtained pursuant to and in the course of the CRA, particularly because ETG was not a party to the CRA and the CRA could be modified or terminated without ETG's knowledge or consent. *See Lamb v. Emhart Corp.*, 47 F.3d 551, 558 (2d Cir. 1995) ("[I]t must be clear that the parties to the agreement had knowledge of and assented to [be bound by the terms of an incorporated document]. When a contract binds parties to terms that are to be decided in the future by one of the parties, the elements of knowledge and assent may be missing."). On its face, the RSA only purports to borrow the definition of "financing" from the CRA. RSA at 1 ¶ c. Further, "carried interest" is not defined in the RSA, and the parties disagree on the meaning of the term. *See* Pl. Opp. at 19–20, ECF No. 25; Def. Mem. at 6. Therefore, the parties' intent as to the scope of paragraph c of the RSA, and specifically ETG's entitlement to a portion of Borealis' carried interest, cannot be determined on the face of the RSA. Because the language of the RSA is ambiguous, its construction presents a factual question that precludes dismissal on a Rule 12(b)(6) motion. *See Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 150, 152 (S.D.N.Y. 2007).

      Moreover, the amended complaint alleges that ETG is entitled to a portion of Borealis' carried interest derived from investments made with financing secured due to the "entrée provided by ETG" or that "ETG made possible," and, specifically, financing provided by KKR. Am. Compl. ¶¶ 2, 4; *see also id.* ¶¶ 3, 14, 20, 22, 26, 30 (describing ETG's entitlement to a portion of carried interest based on estimates of financing provided to Borealis by KKR). Borealis argues that reading the RSA "literally" to entitle ETG to a portion of carried interest

from investments obtained with any and all financing, extending indefinitely, is unreasonable, Def. Reply at 2, but it does not contend that ETG's interpretation of the RSA as entitling ETG to carried interest based on financing provided by KKR is commercially unreasonable, *id.* at 3. And, the RSA can fairly be read to support such a construction. Borealis acknowledges that the purpose of the RSA was to compensate ETG based on financing that ETG made possible through its introduction of Borealis to Miller Buckfire. *Id.* at 8. Moreover, the RSA focuses not just on the CRA, but on the relationship between Borealis and Miller Buckfire. *See* RSA at 1 (stating that ETG made possible two contracts between Borealis and Miller Buckfire); *id.* at 2(d) (requiring the parties to inform each other of any changes to the existing contracts between Borealis and Miller Buckfire, or "if any further agreements are signed relating to the work between Borealis and [Miller Buckfire]"). Thus, ETG's claims are based on a plausible interpretation of the RSA.

Second, Borealis argues that the amended complaint fails to adequately plead that Borealis has already received carried interest, to which ETG is entitled to a 7.5% portion, and failed to pay ETG, Def. Mem. at 2–3, 18, or that Borealis failed to fulfill its obligations with respect to co-investment rights under the RSA, Def. Reply at 11, such that ETG has not adequately alleged that Borealis breached the RSA. The Court disagrees. ETG has adequately pleaded that Borealis has received carried interest and that Borealis has not paid ETG amounts due under the RSA. Am. Compl. ¶ 1 ("Borealis has failed to pay amounts that have become due."); *id.* ¶ 4 (alleging that certain asset sales "generated substantial 'carried interest' . . . as to which ETG is entitled to its 7.5% share pursuant to the RSA" and that "Borealis has failed to pay ETG any portion"). Borealis contends that ETG's use of alternative conjunctives, *see, e.g., id.*

7

¶ 27 (referring to carried interest that Borealis "has received, has become entitled to receive, and/or will soon receive"), means that ETG's pleading leaves open the possibility that no payments are yet due to ETG and, therefore, no breach has yet occurred, Def. Mem. at 19.  But, the use of alternative conjunctives is more appropriately understood as alleging that ETG is entitled to carried interest in investments made by multiple investment funds, at least one of which has already generated carried interest for Borealis, and including other investments that have not yet but will soon generate carried interest.  *See* Am. Compl. ¶¶ 20, 23, 27–28, 30; Pl. Opp. at 16.

ETG has also adequately pleaded that Borealis breached the RSA by, *inter alia*, purposefully structuring remuneration agreements with its investment funds to circumvent its obligations to ETG under the RSA and by failing to disclose to ETG financing that falls within the scope of the RSA.  *See* Am. Compl. ¶¶ 3, 5–7, 21–22, 26, 30–31.  And, ETG has adequately pleaded that Borealis "has failed to make available to ETG certain co-investment rights" to which it is entitled under the RSA, because Borealis has failed to notify ETG when Borealis made investments that would trigger ETG's entitlement to exercise its co-investment rights.  *See id.* ¶¶ 9, 22, 26, 29–30.

Finally, Borealis argues that ETG's claim for declaratory relief should be dismissed as duplicative of its breach of contract claim.  Def. Mem. at 3, 19–20.  Borealis cites one inapposite case, in which the court decided that a declaratory judgment claim was duplicative of a breach of contract claim because the declaratory judgment sought was that the opposing party "failed to meet its obligations" under the contract.  *Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006).  Here, ETG seeks declaratory judgment delineating the scope of ETG's entitlement to a portion of Borealis' carried interest—specifically, that ETG is entitled to

8

carried interest generated by investments made by funds including but not limited to EM I. *See* Am. Compl. at 14.  ETG seeks this relief because Borealis has stated to ETG that it will not pay ETG a portion of carried interest generated by any fund other than EM I.  *See id.*; *see also id.* ¶¶ 24, 28.  This is not duplicative of ETG's claim that Borealis is already entitled to carried interest that triggers ETG's right to payment.

A court has broad discretion regarding its decision to exercise declaratory jurisdiction, *Muller v. Olin Mathieson Chem. Corp.*, 404 F.2d 501, 505 (2d Cir. 1968), and may do so when it will "clarify[] and settl[e] the legal relations in issue" or "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding," *Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992) (citation omitted).  The controversy should also be sufficiently immediate to warrant declaratory judgment.  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005).  Determining the scope of ETG's entitlement to carried interest under the RSA will clarify ETG's right to payment and will obviate the need for the parties to engage in litigation each time any of the relevant funds generates carried interest.  Taking the facts alleged in the complaint as true, several funds will generate carried interest in the near future such that the declaratory relief sought pertains to an issue of sufficient immediacy.  Therefore, the Court shall consider ETG's claim for declaratory judgment.

## CONCLUSION

For the foregoing reasons, Borealis' motion to dismiss is DENIED. The Clerk of Court is directed to terminate the motion at ECF No. 22.

SO ORDERED.

Dated: March 20, 2023
New York, New York

_____
ANALISA TORRES
United States District Judge