UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

ENERGY TRANSPORTATION GROUP, INC.       :

                Plaintiff,       :

   -against-       :       Case No. 1:21-cv-10969-AT-JW

BOREALIS MARITIME LIMITED,       :       **Oral Argument Is Requested**

                Defendant.       :

---------------------------------------------------------------x


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR (1) RECONSIDERATION OF THE COURT'S MARCH 22, 2024
ORDER, BASED ON NEWLY DISCOVERED EVIDENCE; AND (2) LEAVE TO FILE
A SUPPORTING DECLARATION DESCRIBING THAT EVIDENCE**


LLOYD S. CLAREMAN
121 East 61st Street, 2nd Floor
New York, NY 10065
Tel. No. (212) 751-1585
lloyd.clareman@clareman.com

Attorney for Plaintiff
Energy Transportation Group, Inc.

**Table of Contents**

Table of Contents………………………………………………………………….………….i

Table of Authorities……………………………………………………………………………ii

Preliminary Statement……………….……………………………………………...………..1

Relevant Facts………………………………………………………………………………..4

ARGUMENT………………………………………………………………………………...7

Point One:  Newly Discovered Evidence Is Grounds For Reconsideration……………………….7

Point Two:     The New Evidence Undermines Borealis' Prior Arguments, And Shows Why ETG Needs SM Fund Discovery Prior To Summary Judgment Motions…………7

Point Three:  Borealis Should Be Required To Account For Its Discovery Failures………………8

Conclusion…………………………………………………………………………………….10

i

## Table of Authorities

*Cases*

*Carmody v. New York Univ.*, No. 21 CIV. 8186, 2023 WL 5622867,
    (S.D.N.Y. Aug. 31, 2023)

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 182 F.R.D. 97 (S.D.N.Y. 1998),
    *aff'd*, 241 F.3d 135 (2d Cir. 2001)……………………………………..…………………7

*Statutes and Rules*

Fed. R. Civ. P. 37……………………………………………………………………………….8

Local Civil Rule 6.3………………………………………………………………………….1

**Preliminary Statement**

This Memorandum of Law is respectfully submitted by Plaintiff Energy Transportation Group, Inc. ("ETG") in support of its motion, pursuant to Local Rule 6.3 of this Court, for reconsideration of the Court's March 22, 2024 Order (the "March 22 Order") (ECF No. 150). This motion for reconsideration is based upon newly discovered evidence. Because Local Civil Rule 6.3 prohibits the filing of affidavits in connection with a motion for reconsideration, ETG requests leave to file the Declaration of Lloyd S. Clareman dated April 5, 2024, to which copies of the new evidence are attached. Given the nature of this motion and its reliance on new evidence, ETG respectfully submits that the filing of the Clareman Declaration is essential to this motion, and that leave to file it should be granted.

ETG recognizes that it unusual to make a second motion for reconsideration; it is doing so only because this new evidence is highly material. Emails from 2013 between non-party financier Kohlberg Kravis Roberts & Co. ("KKR") and Borealis, that were not produced by Borealis, but were produced by KKR just two days ago, reveal that Borealis' prior representations to this Court regarding the chronology of Borealis' and KKR's discussions of a prospective debt fund, were materially inaccurate.

Borealis had informed this Court, in a Declaration submitted under penalty of perjury by its CEO Christoph Toepfer, and in its briefing regarding discovery into the debt funds (a/k/a the "SM Funds"), that "[i]n November 2017, Borealis <u>began</u> to contemplate a new kind of fund that would provide direct lending to companies seeking to purchase ships in the maritime shipping market." (Toepfer Declaration, ECF No. 65, ¶19 (emphasis added)). *See also* Borealis' Brief in support of its motion for a protective order, ECF No. 64, at p. 7 ("In November 2017 – over five years after the CRA [Capital Raising Agreement] and RSA [Revenue Sharing Agreement] were

executed – Borealis began to consider a new direct lending fund that would provide loans to companies seeking to purchase ships in the maritime shipping market.")  In that same brief, Borealis submitted a 14-paragraph chronology to the Court, that likewise purported to show that Borealis' marketing of a debt fund to KKR (and others) began in November 2017.  Borealis claimed that this timing was too remote from Borealis' introduction to KKR by Miller Buckfire to be considered part of any "financing" sourced by Miller Buckfire.  (*Id.*, at pp. 19-20.)

The newly produced documents show that the information provided to the Court by Borealis regarding the timing of consideration and promotion of a debt fund was inaccurate and incomplete.  Emails between KKR and Borealis that were never produced by Borealis, and only produced by KKR (following extensive negotiations) on April 3, 2024, show that Mr. Toepfer's sworn statement, and Borealis' representations regarding the supposedly remote timing of when Borealis first "began to contemplate" a debt fund, are not accurate.  These emails between Mr. Toepfer and KKR's Brian Dillard show conclusively that Borealis pitched the idea of a debt fund to KKR on March 27, 2013.  Mr. Toepfer even transmitted a promotional brochure regarding the concept, and KKR responded positively.  (Clareman Dec., Exs. A, B, C.)  Those March 2013 discussions, which were four years earlier than the inception date claimed by Borealis in its papers in support of its motion for a protective order, occurred while Miller Buckfire was still advising Borealis.  They occurred before the EM Funds were structured or funded.  These emails prove that when Miller Buckfire introduced Borealis to KKR, it provided a source of financing to Borealis that was capable of, and interested in, delivering enormous amounts of financing for equity and debt funds.  Borealis' contention that the debt funds were first "contemplated" and promoted more than four years later, in November 2017, is clearly inaccurate.

ETG had no way of challenging those representations, until now. Borealis' reply brief boasted that its detailed chronology of events, which made no mention of these 2013 communications, was "undisputed" by ETG. *See* Borealis Reply Brief, ECF No. 77, at p. 6. Given the absence of any discovery regarding the SM Funds, Borealis was left free to argue, misleadingly, that "[t]his chronology, which lists a number of intervening events, undermines any 'continuing connection' between the 2011 introduction and the SM Funds." (*Id.*) The absence of full access to information, which only discovery can provide, made possible Borealis' one-sided presentation.

It is unclear why these emails were not produced by Borealis. Over a year ago, once the parties' document production was substantially complete, ETG's counsel realized that Borealis had produced virtually no emails (only nine) for the entire period between February 23, 2013 and November 17, 2013 (the emails at issue, produced by KKR, are within that period). This was odd, because that was a period of intensive activity and, inevitably, associated email correspondence, between KKR and Borealis, as they negotiated and executed the structure and terms of their prospective joint venture. ETG's counsel called this gap in Borealis' production to the attention of Borealis' counsel, more than once. All such inquiries were consistently rebuffed – without any substantive explanation. (Clareman Dec., ¶¶ 9-12.)

We now have learned that emails from that "gap" period are crucial to an understanding of the scope of the potential equity and debt fund financing that Miller Buckfire's introduction of KKR made available to Borealis in 2013. It turns out that both equity and debt funds were on the table for consideration, thanks to the introduction of KKR to Borealis by Miller Buckfire (the latter having been introduced to Borealis by ETG). Contrary to Borealis' assertions, the SM Funds are not some newly conceived idea that had not been "contemplated" until November 2017; they were in play from the beginning of the KKR-Borealis relationship. The fact that they took time to

3

germinate is far less significant than the fact that the concept was being discussed from the outset back in 2013, thanks to ETG's introduction of Miller Buckfire to Borealis, and Miller Buckfire's introduction of Borealis to KKR.

Borealis should be required to account for its failure to provide ETG with any explanation for the gap in its document production. It should be ordered to inform the Court, and ETG, what happened to these critical documents, some of which have now been produced by KKR. Most importantly, ETG respectfully requests that this Court reconsider its ruling, denying ETG any discovery regarding the SM Funds. It is no longer a matter of conjecture that (a) Borealis' claims regarding the genesis of the SM Funds is inaccurate and incomplete; (b) there are important documents bearing on the origins of the SM Funds that Borealis has failed to produce; and, most critically, (c) a deferral of SM Fund discovery that prevents ETG from obtaining other relevant evidence regarding the SM Funds will unfairly hamper ETG's ability to fairly oppose Borealis' eventual summary judgment motion. Without evidence of the type that KKR produced on April 3, Borealis will be able to assert whatever it wishes, accurate or not.

**Relevant Facts**

Notwithstanding Borealis' prior representations to the contrary, Borealis in fact had begun to contemplate a direct lending fund in December 2012, right around the time of its initial discussions with KKR. (*See* Clareman Dec. Ex. A, March 27, 2013 email, third paragraph, in which Mr. Toepfer states that his shipping debt fund idea "is a project we started to work on back in December.") Borealis and KKR had their first meeting, arranged by Miller Buckfire, in November 2012, and in February 2013 they began negotiating a term sheet respecting the contours of KKR's financing of Borealis, which would include the requirement that Borealis bring all opportunities in the shipping space exclusively to KKR, at least in the first instance. In March,

4

2013, while those negotiations were barely underway, the newly produced evidence shows that Mr. Toepfer of Borealis wrote KKR's Brian Dillard, who was in charge of the EM Funds' financing, as follows:

> We also discussed with Stephen [a non-KKR investor] **a shipping debt fund idea we have**…. We did not raise that project with you yet, as we felt it was not going to be within your group's investment target. However, **once we have more formal discussions on a JV agreed, it was an idea we wanted to float with you as possibly other pockets of capital within KKR may well be suitable for such opportunity.**
>
> Attached is a short presentation. We have a few high profile potentials interested in this project here in the UK as well, and it is a project we started to work on back in December [2012], somewhat parallel to our distressed equity capital raising efforts. **Naturally, if we are putting a JV together with KKR, such project would fall in to the basket of opportunities we would like to look at together with you as well.** (emphasis added)

The presentation that was attached, produced by KKR on April 3, appears conceptually the same as the KKR-financed debt fund, known as the SM Funds, that ultimately came to fruition. (Clareman Dec., Ex. B.) In another just-produced email in response to Mr. Toepfer's pitch, Mr. Dillard reacted positively, stating, "I think the lending strategy is very interesting and could be something we look at doing through a separate pool of capital." (Clareman Dec., Ex. C.) That appears to be exactly what eventually occurred.

Borealis has distorted the timeline of its discussions of a debt fund with KKR, claiming repeatedly that Borealis only "began to consider" or "began to contemplate" a debt fund in November 2017. This is not a minor oversight. The crucial question in this case concerns the nature and extent of the "financing" received by Borealis that reasonably can be attributed to Miller Buckfire's introduction of KKR to Borealis. Borealis has argued to this Court that the debt funds are too remote in time, that there are too many intervening events, to be considered part of the financing sourced by Miller Buckfire. But here we have evidence that shows otherwise. Evidence

that shows that right at the time when Borealis was still represented by Miller Buckfire, Borealis and KKR were discussing a debt fund of the same type that would ultimately become the SM Funds. Even if Borealis lost these emails in some as-yet unexplained fashion, Mr. Toepfer knew about his 2013 communications with KKR regarding the debt fund idea, yet he made no mention of them in his Declaration. A misleading narrative was thereby presented to the Court.

Borealis' failure to provide these emails to opposing counsel, or to make the existence of these discussions known to the Court, has prejudiced ETG in connection with the SM Fund discovery dispute. ETG's counsel first raised with Borealis' counsel, over a year ago, the issue of a large temporal gap in Borealis' production. Borealis produced almost no emails for the period from February 23, 2013 through November 17, 2013 – which made no sense, as that was a period of high activity when the KKR-Borealis joint venture was being negotiated and formed. Borealis' counsel responded that they had no explanation for the gap; and they refused to provide one. ETG's counsel raised this issue on other occasions, including by sending an email on February 2, 2024, describing the gap in detail, and requesting a remedy, or at least an explanation. Borealis' counsel dismissed the email out of hand and refused even to discuss it. See Clareman Dec. Par. 9, and Ex. D. ETG was left to try to obtain some of the missing emails from KKR. After months of painstaking "meet and confer" negotiations, KKR finally produced these smoking-gun emails on April 3. (Clareman Dec., ¶¶7, 10.)

The non-production of these emails, and Borealis' misleading account of the debt fund chronology, disserve the interests of justice. Most importantly, they justify reconsideration of the Court's March 22 Order reaffirming its decision to deny ETG any discovery into the debt funds until after summary judgment motions are decided. These newly produced documents illustrate

6

how severely ETG will be prejudiced in its ability to defend against Borealis' motion, if ETG lacks the ability to rebut Borealis' incomplete narrative with a balanced and full factual record.

## ARGUMENT

**Point One: Newly Discovered Evidence Is Grounds For Reconsideration.**

It is well established that newly discovered evidence is a permissible basis for reconsideration, under both Fed. R. Civ. P. 59 and, as here, Local Civil Rule 6.3. *See, e.g., U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 182 F.R.D. 97, 100 (S.D.N.Y. 1998), *aff'd*, 241 F.3d 135 (2d Cir. 2001) ("a motion for reconsideration or reargument under Local Civil Rule 6.3, provides the Court with an opportunity to correct manifest errors of law or fact, hear newly discovered evidence…or prevent manifest injustice.")

ETG understands that it is unusual for a party to make a motion for reconsideration, and then again ask for reconsideration of the ensuing decision. In the absence of the newly discovered evidence that only came into its possession two days ago, ETG would not be making this second reconsideration motion, and instead would rely upon its Rule 72(a) objection.

The previously undisclosed emails between Borealis and KKR from March 2013 are so material that ETG feels that it would be irresponsible not to bring them to this Court's attention via this second motion for reconsideration. ETG did not know, and could not have known, about these emails previously, and therefore neither did this Court. ETG believes that the Court should have a full opportunity to consider this new evidence, and evaluate its impact upon its prior ruling.

**Point Two:   The New Evidence Undermines Borealis' Prior Arguments, And Shows Why ETG Needs SM Fund Discovery Prior To Summary Judgment Motions.**

As already discussed, the new documents prove that Borealis' representations regarding the timing of its initial contemplation of a debt fund were unreliable. We now know that the debt fund idea was expressly discussed between Borealis and KKR in 2013, contemporaneously with

7

the equity financing that KKR provided in 2013 and continued to provide, in two more tranches, in the ensuing two years. The fact that the debt fund idea was on the table for discussion from the very beginning, bolsters ETG's argument that Miller Buckfire can properly be said to have introduced Borealis to a source of funding – KKR – that was in a position to provide financing for both equity and debt funds. KKR did, in fact, over the ensuing years, provide $400 million in equity funding to Borealis, and then provided at least another $250 million (and apparently more via a subsequent upsizing) for the "shipping debt fund idea" that became the SM Funds.

This new evidence is a clear indication of the manner in which ETG will be unfairly disadvantaged if it is required to defend against a summary judgment motion in the absence of evidence, obtained through discovery, concerning these debt funds. ETG should be given a full opportunity to discover and show the connection between Miller Buckfire's introduction of KKR to Borealis in late 2012, and KKR's service as source of financing for Borealis to manage in both the ship acquisition and ship lending arenas. These new documents greatly help; but there remains much information about the debt funds that ETG still has had no opportunity to discover.

**Point Three:  Borealis Should Be Required To Account For Its Discovery Failures.**

"Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses." *Carmody v. New York Univ.*, No. 21 CIV. 8186, 2023 WL 5622867, at *3 (S.D.N.Y. Aug. 31, 2023)  These powers include the award of monetary sanctions, as well as broad powers of preclusion and adverse instructions to a jury.

ETG is not seeking sanctions *per se* at this time, because too many unanswered questions remain. ETG respectfully submits that the Court should use its authority under Rule 37, and its inherent power, to get to the bottom of what happened here. Borealis failed to produce a substantial volume of discoverable information from the period between February 23 and November 17, 2013,

which was a critical period of time. ETG's counsel brought this seemingly inexplicable gap to the attention of Borealis' counsel on several occasions over the course of a year, without receiving any substantive response beyond being told that there was nothing more for Borealis to produce. No explanation for the gap was ever provided. (Clareman Dec., ¶¶ 4-5, 9-12)

We now know that many emails exist – or once existed – within that gap period that Borealis has never produced. KKR, despite its prolonged resistance, has finally produced hundreds of emails from that period, between Borealis and KKR, that Borealis did not produce. (Clareman Dec., ¶10.) Those included the emails discussed herein that undermine the "chronology" of events regarding the origins of the debt funds that Borealis presented to this Court. Even if Borealis somehow did not have those emails (which it sent or received), or could not obtain access to them via its business partner KKR, Mr. Toepfer still had to have known of these 2013 communications regarding his "shipping debt fund idea." Despite that knowledge, Borealis claimed, inaccurately, that contemplation of a debt fund did not begin until November 2017, years after Miller Buckfire had introduced KKR to Borealis.

ETG submits that the Court should require Borealis to answer the following questions:

1. Did Borealis know of the March 27, 2013 emails between Borealis and KKR concerning the debt fund concept when it filed its papers in support of its motion for a protective order?

2. Why did Mr. Toepfer represent to the Court that it was not until November 2017 that Borealis began to contemplate the possibility of a debt fund, when that idea existed, and had been discussed with KKR, in 2013?

3. What investigation of the gap in Borealis' production did Borealis' counsel make when it was first called to their attention by ETG's counsel on March 8, 2013? Was any

9

investigation made when the issue was raised again, in detail, on February 2, 2024, in ETG's counsel's email? If so, what was done?

4. Were Borealis' emails from this gap period destroyed? Why do they not exist? If they do exist, why were they not produced?

ETG submits that once we have answers to these questions, it may then be appropriate to consider potential sanctions.

## Conclusion

For the foregoing reasons, ETG respectfully submits that its motion for reconsideration, and for leave to file the Clareman Declaration in support thereof, should be granted in all respects.

Dated: New York, New York
April 5, 2024

                                              LLOYD S. CLAREMAN

                                              By: /s/ Lloyd S. Clareman
121 East 61st Street, 2nd Floor
New York, NY 10065
Tel. No. (212) 751-1585
lloyd.clareman@clareman.com

Attorney for Plaintiff
Energy Transportation Group, Inc.