**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ENERGY TRANSPORTATION GROUP, INC.,

              Plaintiff,

    -against-

BOREALIS MARITIME LIMITED,

              Defendant.

Case No. 1:21-cv-10969-AT-JW

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND INCORPORATED OPPOSITION
TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Jenny H. Kim
Lindsey Ruff
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2354
E-mail: jkim@bsfllp.com
       lruff@bsfllp.com

*Counsel for Borealis Maritime Limited*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................ 1

RELEVANT FACTS ............................................................................. 4

    I.    The Capital Raising Agreement ................................................ 4

    II.    The Revenue Sharing Agreement .............................................. 5

    III.    Agreement Relating To Borealis Maritime .................................... 6

    IV.    The Embarcadero Maritime Transactions ...................................... 6

    V.    The Stanley Maritime Transactions ............................................ 8

ARGUMENT ...................................................................................... 9

I.    Borealis Is Entitled To Summary Judgment On ETG's Sole Breach Of Contract Claim ................................................................................ 9

    A.    ETG's Claim Is Time-Barred ................................................ 9

    B.    ETG Has No Standing To Bring Its Claim .................................. 12

    C.    ETG's Claims For Compensation From EM2, EM3, SM1 And SM2 Are Barred Under The Express Terms Of The RSA ............................... 15

        1.    ETG Cannot Show The Necessary "Continuing Connection" Or A "Direct And Proximate Link" Between Its Miller Buckfire Introduction And The EM2, EM3, SM1 and SM2 Transactions ............. 15

        2.    ETG's "Investor"-Based Interpretation Of The RSA Is Factually Unsupported And Contradicted By Its Own Agreed-Upon Contract Language .......................................................................... 19

II.    ETG's Motion For Summary Judgment Should Be Denied .............................. 23

    A.    ETG Fails To Demonstrate That Its Claim With Respect To EM1 Is Timely .............................................................................. 23

    B.    ETG Impermissibly Seeks A Piecemeal Summary Judgment Ruling ................. 27

CONCLUSION ...................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*159 MP Corp. v. Redbridge Bedford, LLC,*
33 N.Y.3d 353 (2019) ................................................................ 9

*Arado v. General Fire Extinguisher Corp.,*
626 F. Supp. 506 (N.D. Ill. 1985) ............................................. 27

*Bankboston (Guernsey) Ltd. v. Schupak,*
2000 WL 423526 (S.D.N.Y. Apr. 18, 2000) ............................. 23

*Beal Sav. Bank v. Sommer,*
8 N.Y.3d 318 (2007) ................................................................. 9

*BellSouth Telcoms. v. W.R. Grace & Co.-Conn.,*
918 F. Supp. 533 (D. Conn. 1994) ............................................ 9

*Boyle v. Readers' Subscription Inc.,*
481 F. Supp. 156 (S.D.N.Y.) .................................................... 15

*Cap. Access Servs. Inc. v. Direct Source Seafood, LLC,*
2018 WL 3093967 (S.D.N.Y. June 22, 2018) .......................... 18

*Cato Cap. LLC v. Hemispherx Biopharma, Inc.,*
70 F. Supp. 3d 607 (D. Del. 2014) ........................................... 17

*City of New York v. Cotroneo Marino's United Electric Co.,*
269 A.D.2d 154 (1st Dep't 2000) .............................................. 25

*Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l,*
790 F.3d 411 (2d Cir. 2015) ............................................... 12, 14

*Doty v. Sun Life Assurance Co. of Canada, Civ.,*
2009 WL 3046955 (S.D. Tex. July 30, 2009) .......................... 27

*Ely-Cruikshank Co. v. Bank of Montreal,*
81 N.Y.2d 399 (1993) ......................................................... 10, 25

*Energy Transportation Grp., Inc. v. Borealis Mar. Ltd.,*
2023 WL 2586141 (S.D.N.Y. Mar. 20, 2023) .......................... 18

*Engelhard Corp. v. Rsch. Corp.,*
268 A.D.2d 358 (1st Dep't 2000) .............................................. 15

*Eujoy Realty Corp. v. Van Wagner Commc'ns, LLC,*
22 N.Y.3d 413 (2013) ......................................................... 9, 21

*Ferghana Partners Inc. v. Bioniche Life Sciences Inc.*,
   2011 WL 5385096 (Sup. Ct. N.Y. Cnty. 2011) ........................................................ 16

*Gil v. Gleitzman*,
   2024 WL 901406 (Del. Ch. Mar. 4, 2024) ........................................................ 10

*Goldman v. Turner*,
   858 F. Supp. 49 (S.D.N.Y. 1994) ........................................................ *passim*

*Goodrich v. Gonzalez*,
   451 F. Supp. 747 (E.D.N.Y. 1978) ........................................................ 27

*Greene v. Hellman*,
   51 N.Y.2d 197 (1980) ........................................................ 18

*Guilbert v. Gardner*,
   480 F.3d 140 (2d Cir. 2007) ........................................................ 10

*Hahn Automotive Warehouse, Inc. v. American Zurich Ins. Co.*,
   18 N.Y.3d 765 (2012) ........................................................ 10

*In re Century/ML Cable Venture*,
   311 F. App'x 455 (2d Cir. 2009) ........................................................ 14

*Karelitz v. Damson Oil Corp.*,
   820 F.2d 529 (1st Cir. 1987) ........................................................ 16

*Kocak v. Dargin*,
   199 A.D.3d 456 (1st Dep't 2021) ........................................................ 26

*Kurzman Karelsen & Frank v. Kaiser*,
   283 A.D.2d 330 (1st Dep't 2001) ........................................................ 3, 13, 24

*Leon v. Martinez*,
   84 N.Y.2d 83 (1994) ........................................................ 2, 13, 24

*Liberty Life Assur. Co. of Bos. v. Gilbert*,
   507 F.3d 952 (6th Cir. 2007) ........................................................ 13

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................................ 9

*Maxine Co., Inc. v Brinks's Global Servs. USA, Inc.*,
   94 A.D.3d 53 (1st Dep't 2012) ........................................................ 22

*Moore v. Sutton Res., Ltd.*,
   1998 WL 67664 (S.D.N.Y. Feb. 18, 1998) ........................................................ 17

*Paguay v. ESH Rest. Grp. LLC*,
  2024 WL 1376163 (S.D.N.Y. Apr. 1, 2024) ............................................................................ 19

*Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*,
  612 F. Supp. 3d 263 (S.D.N.Y. 2020) .................................................................................. 14

*Quadrant Structured Prods. Co. v. Vertin*,
  23 N.Y.3d 549 (2014) ........................................................................................................ 9

*Rabouin v. Metropolitan Life Ins. Co.*,
  182 Misc.2d 632 (N.Y. Sup. Ct. 1999) ................................................................................ 25

*Rosenblatt v. Christie, Manson & Woods Ltd.*,
  2005 WL 2649027 (S.D.N.Y. Oct. 14, 2005) ....................................................................... 16

*SM Kids, LLC v. Google LLC*,
  963 F.3d 206 (2d Cir. 2020) ............................................................................................... 12

*Stitching v. Schreiber*,
  407 F. 3d 34 (2d Cir. 2005) ............................................................................................... 26

*T & N PLC v. Fred S. James & Co. of NY, Inc.*,
  29 F.3d 57 (2d Cir. 1994) ............................................................................................. 10, 25

*Terry v. Charitable Donor Advised Fund, L.P.*,
  2024 WL 382113 (S.D.N.Y. Feb. 1, 2024) ........................................................................... 14

*Tour Cent. Park Inc. v. Thor 38 Park Row LLC*,
  223 A.D.3d 546 (1st Dep't 2024) ....................................................................................... 15

*U.S. Bank Nat'l Ass'n as Tr. to Bank of Am., N.A. v. KeyBank, Nat'l Ass'n*,
  2023 WL 2745210 (S.D.N.Y. Mar. 31, 2023) ...................................................................... 12

*United States v. Am. Int'l Grp., Inc.*,
  1997 WL 66786 (S.D.N.Y. Feb. 14, 1997) ........................................................................... 27

*Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*,
  178 F. Supp. 655 (S.D.N.Y. 1959) ...................................................................................... 16

*Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A.*,
  2014 WL 1259630 (S.D.N.Y. Mar. 27, 2014) ................................................................. 10, 25

*Welwart v. Dataware Electronics*,
  277 A.D.2d 372 (2d Dep't 2000) ........................................................................................ 25

## **Rules**

CPLR § 213 .......................................................................................................................... 9

Fed. R. Civ. P. 56 .............................................................................................. 1, 9, 27

**Other Authorities**

17 C.J.S. CONTRACTS § 608 ............................................................................... 15

4 CORBIN ON CONTRACTS § 879 ........................................................................ 13

9 CORBIN ON CONTRACTS § 50.2 ..................................................................... 2, 11

RESTATEMENT (2D) OF CONTRACTS § 321 (1981) ............................................. 2, 11

Defendant Borealis Maritime Ltd. ("Borealis") submits this memorandum of law in support of its: (1) motion for summary judgment as to the sole claim of Plaintiff Energy Transportation Group, Inc. ("ETG"); and (2) opposition to ETG's motion for partial summary judgment (ECF No. 218 ("ETG Br.")) pursuant to Federal Rule of Civil Procedure 56.[1]

## PRELIMINARY STATEMENT

In its amended complaint (ECF No. 13, "Amended Complaint" or "Am. Cmplt.") in this action, ETG alleges a single cause of action for Borealis's purported breach of the parties' Revenue Sharing Agreement ("RSA"). That claim should be dismissed as time-barred based on four irrefutable facts.

First, the RSA unequivocally provides that ETG will be granted certain interests only upon the occurrence of a future contingent event, what the RSA defines as a "Financing" that Borealis may obtain at some point in the future:

> *In the event Borealis obtains Financing* (as defined in the Capital Raising Agreement), Borealis *will grant* ETG (i) a 7.5 % interest in the carried interest of Borealis (or any other related Borealis entity) in investment(s) (whether equity, loans or otherwise) made with the Financing; and (ii) the option, but not the obligation, to co-invest with Borealis in such investment(s), 7.5% (but no more or less than 7.5%) of the amount invested by Borealis.

(Ruff Decl. Ex. A, the "RSA" ¶ (c) (emphasis added)) ETG's principal, Kimball Chen ("Chen") admits that Borealis's obligations only arise upon the occurrence of this future contingent event. (Ruff Decl. B, the April 11, 2024, deposition transcript of Kimball Chen, "Chen Depo. Tr." 100:23-102:3)

---

[1] Submitted herewith is the Declaration of Lindsey Ruff, sworn to on September 5, 2024 ("Ruff Decl."). Borealis is filing this memorandum twice: once in support of its affirmative motion for summary judgment on ETG's sole claim for breach of contract and again, in opposition to ETG's motion for partial summary judgment. References to Borealis's Rule 56.1 Statement are in the form "Borealis 56.1 Statement."

Second, it is undisputed that one of those Financings that later materialized was a fund called Embarcadero I ("EM1"), and that ETG also seeks recovery for two later funds named Embarcadero II ("EM2") and III ("EM3," and with EM1 and EM2, the "EM Funds"). (Chen Depo. Tr. 55:12-18; Am. Cmplt. at 14)

Third, it is undisputed that the EM Funds all closed more than six years before the filing of the original Complaint in December 2021. Fourth, under New York law, the time for filing breach of contract claims is six years from accrual, and ETG's claim is simply too late.

Under the RSA, Borealis's contractual obligation to perform (*i.e.* to grant certain interests to ETG in a Financing) arises only *if and when* Borealis is able to obtain a Financing – a contingent future event. And it is axiomatic that when a contact grants a right in a contingent future event, that grant only operates as a mere promise "to assign the right *when it arises*." RESTATEMENT (2D) OF CONTRACTS § 321(2) (emphasis added); *see also* 9 CORBIN ON CONTRACTS § 50.2. Further, as this Court held in *Goldman v. Turner*, where an " obligation to pay depends on the happening of a contingent future event, . . . the Statute of Limitations began to run when that condition was fulfilled." 858 F. Supp. 49, 50 (S.D.N.Y. 1994), *aff'd*, 50 F.3d 2 (2d Cir. 1995). Here, the fulfilled condition – the existence of an alleged Financing – occurred on each of the EM Funds' closing dates: November 27, 2013 for EM1, October 6, 2014 for EM2, and August 3, 2015 for EM3. Since all those closing dates were more than six years before the filing of the original Complaint, that Complaint is time-barred.

In fact, because ETG was never assigned any interests in the EM Funds, it also has no standing to sue for the specific damages alleged in the Complaint. ETG contends that Borealis breached the RSA by (1) "failing to pay ETG 7.5% of the [carried interest]" from Financings (as that term is defined in the relevant agreements); and (2) "failing to provide ETG with the 7.5%

co-investment opportunity."  (Am. Cmplt. ¶¶ 34, 35)   But ETG is vainly trying to skip a vital

step:  ETG is suing Borealis as if the RSA had presently assigned to ETG interests (alleged

Financings) in a future, potential Financing, when – under fundamental contract law – the RSA

did not and could not.  Instead, ETG needed to receive an assignment of rights each time one of

the alleged Financings closed, but it concededly did not.  Accordingly, all ETG has now is a

claim against Borealis for failing to make those assignments, *Kurzman Karelsen & Frank v.

Kaiser*, 283 A.D.2d 330, 330-331 (1st Dep't 2001), but, as noted, that claim is time-barred.

Finally, summary judgment should also be granted for any claims relating to EM2 and

EM3 on the independent basis that the RSA does not entitle ETG to any compensation from

those transactions.[2]  First, ETG has not established the necessary causal connection between its

introduction of Borealis to Miller Buckfire and these later transactions, EM2 and EM3.  Second,

ETG has now conceded that the definition of "Financing" in the RSA is transaction-based, and

EM2 and EM3 are indisputably separate transactions in which neither Miller Buckfire nor ETG

had any involvement.

---

[2]   Two additional agreements have come up in this litigation, Stanley Maritime LLC ("SM1"),
which closed in 2018, and Stanley Maritime II, LLC ("SM2" and together with SM1, the "SM
Funds"), which closed in 2023.  (*See* ECF No. 65, "Toepfer Decl." ¶¶ 19-28)  Given the
significant passage of time between execution of the RSA and the closing of these two
transactions – and the complete lack of involvement by Miller Buckfire or ETG in those two
transactions – Borealis moved for a protective order precluding discovery into SM1 and SM2.
(ECF No. 63)  The Honorable Jennifer E. Willis granted that motion pending the outcome of
these summary judgment motions, noting that any discovery into the SM Funds "is most relevant
to the issue of damages and only minimally relevant to substantive arguments regarding the
scope of the RSA."  (ECF No. 137 at 14)  Judge Willis issued the temporary protective order
such that any information regarding the SM Funds would "only be discoverable after a
dispositive ruling that the scope of the RSA does cover such funds."  (*Id.*)  Accordingly, Borealis
requests that the Court also rule that the scope of the RSA does not extend to these two SM
transactions.

In turn, ETG's motion for partial summary judgment should be denied. The one claim for which it seeks relief – related to EM1 – is time-barred. Additionally, its motion for partial summary judgment does not seek resolution of its entire claim for EM1, and summary judgment should not be used for piecemeal resolution of issues in litigation.

As demonstrated in greater detail below, Borealis's motion for summary judgment should be granted, and ETG's partial summary judgment motion should be denied.

## RELEVANT FACTS

### I.    The Capital Raising Agreement

On or about April 2, 2012, Borealis and Miller Buckfire ("Miller Buckfire") executed a Capital Raising Agreement (Ruff Decl. Ex. C, the "CRA"). The CRA provides, among other things, that Miller Buckfire would receive compensation for arranging "Financings" for Borealis. (*Id.* at 1-3) The CRA defines "Financing" as "an issuance, sale or placement, through a rights offer or otherwise, of the equity, equity-linked or debt securities, instruments, or obligations of the Company or any loan or other financing with one or more lenders and/or investors (each such lender or investor, an 'Investor')." (*Id.* at 1-2) In March and April 2012, Borealis sent drafts of the CRA to Chen, the Chief Executive Officer of ETG, for his comment. (Chen Depo. Tr. 44:2-19, Ruff Decl. Ex. D; Borealis 56.1 Statement ¶ 3; ECF No. 207-1 ¶ 3) Borealis also provided ETG with a copy of the final executed version of the CRA. (Ruff Decl. Ex. E; Borealis 56.1 Statement ¶ 4)

Pursuant to the CRA, Miller Buckfire introduced Borealis to over 40 potential investors in 2012 and 2013. (*See, e.g.*, Ruff Decl. Exs. F, G) One of those potential investors was Kohlberg Kravis & Roberts & Co. ("KKR"). Miller Buckfire was involved in, and ultimately compensated $2 million for, only one Financing under the terms of the CRA, EM1. (Ruff Decl.

4

Ex. H)  On November 25, 2013, Miller Buckfire provided Borealis with a written notice of its termination of the CRA.  (*Id.*)

## II.    The Revenue Sharing Agreement

On or about August 1, 2012, Borealis and ETG entered into the RSA.  (Ruff Decl. Ex. A) The RSA incorporates the definition of "Financing" from the CRA between Borealis and Miller Buckfire.  (Borealis 56.1 Statement ¶ 9)  During negotiations of the RSA, ETG referred to the RSA as an agreement in which Borealis and ETG would agree "to a reasonable fee [for ETG] for any capital raised by MB for shipping investments led by Borealis."  (Ruff Decl. Ex. I)

Pursuant to paragraph (c) of the RSA:

In the event Borealis obtains Financing (as defined in the Capital Raising Agreement), Borealis *will grant* ETG (i) a 7.5 % interest in the carried interest of Borealis (or any other related Borealis entity) in investment(s) (whether equity, loans or otherwise) made with the Financing; and (ii) the option, but not the obligation, to co-invest with Borealis in such investment(s), 7.5% (but no more or less than 7.5%) of the amount invested by Borealis.

(RSA ¶ (c) (emphasis added))  ETG concedes that this paragraph of the RSA refers to a contingent future event, and that the contingent future event is if and when Borealis obtains a "Financing."[3]  (Chen Depo. Tr. 51:23-52:13)  ETG contends that EM1 is one of those contingent future events that later materialized.  (*Id.* 55:12-18)  ETG also seeks recovery for EM2 and EM3.  (Am. Cmplt. at 14)

Chen has testified that the CRA and RSA's definition of "Financing" is transaction-based, and not client-based.  (Chen Depo. Tr. 24:7-19, 26:10-24)  Chen has also testified that, in taking the position that the RSA reaches any transaction Borealis executes with KKR or its affiliates, he is relying on a section of the CRA that is not incorporated into the RSA.  (Chen

---

[3] The parties also do not dispute that a Financing under the RSA has the same meaning as it does in the CRA.  (Borealis 56.1 Statement ¶ 9; ECF No. 207-1 ¶ 9)

Depo. Tr. 124:22-127:14)  That section appears in paragraph one of the CRA and states that Miller Buckfire will "provide financial advice and assistance to the Company in structuring and effecting a Financing, identify potential Investors (as defined below) and, at the Company's request, contact such Investors."  (CRA at 1)

The RSA also provides that ETG is acting as a broker-dealer for "all services rendered to Borealis" by ETG.  (RSA ¶ (f))

### III.    Agreement Relating To Borealis Maritime

On April 8, 2013, ETG and Miller Buckfire entered into an agreement entitled "Agreement Relating to Borealis Maritime" (the "Borealis Agreement").  (Borealis 56.1 Statement ¶ 13; Ruff Decl. Ex. J)  The Borealis Agreement was modeled "as closely as possible" to the RSA and, like the RSA, adopted the definition of "Financing" set forth in the CRA. (Borealis 56.1 Statement ¶ 14; Ruff Decl. Ex. K; Chen Depo. Tr. 34:8-21))

Pursuant to the Borealis Agreement, Miller Buckfire paid ETG 7.5% of the $2 million fee (minus expenses) that Miller Buckfire received for EM1.  (Chen Depo. Tr. 65:11-66:23; Ruff Decl. Exs. L, M, N)  ETG has never received any additional payments under the terms of the Borealis Agreement – for EM2, EM3 or anything else – and it has brought no claims against Miller Buckfire for additional payments under the terms of the Borealis Agreement.  (Chen Depo. Tr. 67:22-68:2)

### IV.    The Embarcadero Maritime Transactions

The EM1 transaction was memorialized in an LLC agreement that closed on November 27, 2013.  The parties to the EM1 transaction were Powell Investors L.P., KKR European Special Opportunities Limited, 8 Capital Partners L.P., KKR Financial Holdings III, First Names Corporation S.à.r.l. as Trustee of Bark Trust and Didi Trust, Maritime Investment Advisors Limited, and Didi Trust and Bark Trust.  (Ruff Decl. Ex. O)

The EM2 transaction was memorialized in an LLC agreement that closed on October 6, 2014. The parties to the EM2 transaction were Powell Investors L.P. and First Names Corporation S.à.r.l. as Trustee of each of Didi Trust and Bark Trust. (Ruff Decl. Ex. P)

The EM3 transaction was memorialized in an LLC agreement that closed on August 3, 2015. The parties to the EM3 transaction were Powell Investors II L.P., Valencia Investors Limited and First Names Corporation S.à.r.l. as Trustee of each of Didi Trust and Bark Trust. (Ruff Decl. Ex. Q)

ETG was not involved in any negotiations with respect to EM1, EM2 or EM3. (Ruff Decl. Ex. R, the "ETG RFAs" at 2) ETG has not participated in any meetings or discussions with KKR or its affiliates, and ETG has not participated in any meetings or discussions with any potential Borealis investor since May 2012. (*Id.*) ETG was never a "senior advisor" to Borealis. (Chen Depo. Tr. 109:20-110:11) Further, neither Miller Buckfire nor ETG had any involvement with EM2 or EM3. (Chen Depo. Tr. 61:2-5, 63:3-11; ETG RFAs at 2)

On November 28, 2013, ETG was forwarded an email drafted by litigation counsel, Debevoise & Plimpton LLP ("Debevoise & Plimpton"), in anticipation of a "lawsuit" with Borealis that requested "confirmation that you [Borealis] intend to fulfill your end of the agreement." (Ruff Decl. Ex. S) On December 19, 2013, Frithjof Fuchs, an associate of Chen, asked ETG's litigation counsel at Debevoise & Plimpton to draft another email to send to Borealis. That same day, ETG's counsel provided a draft email. The draft email included the following language: "[W]e, [ETG,] must expressly reserve the right to demand, and presently expect to demand, the consideration owed to us under what [Borealis] term[s] the 'legal paragraphs.'" (Ruff Decl. Exs. T, U) A version of the draft email was sent by ETG to Borealis on December 28, 2013. (Ruff Decl. Ex. V)

Borealis never assigned to ETG, and ETG never demanded an assignment of, the 7.5 percent of the carried interest or the option to co-invest in any of the EM Funds.  (ETG RFAs at 4-5; Chen Depo. Tr. 54:8-55:4, 55:23-56:6, 60:12-22, 62:13-63:2, 99:5-105:3)  ETG also never asked to co-invest in any of the three EM Funds.  (Chen Depo. Tr. 56:24-57:4, 57:25-58:15, 60:23-61:5, 63:3-64:2)

## V.    **The Stanley Maritime Transactions**

In November 2017, Borealis began to contemplate a new kind of fund that would provide direct lending to companies seeking to purchase ships in the maritime shipping market.  (ECF No. 65, Toepfer Decl. ¶ 19)  Unlike the EM Funds, the assets of which were shipping vessels, the assets of these direct lending funds would be the loans that were provided to shipping companies to finance ships in any sector within the shipping industry.  (*Id.*)  Borealis's proposed direct lending fund was ultimately named Stanley Maritime LLC ("SM1") and closed on October 4, 2018 with Oak Hill Advisors ("Oak Hill") and the Alternative Debt Fund Division of KKR's London office ("KKR Alternative Debt") as investors.  (*Id.* ¶¶ 19, 24, 25)

Stanley Maritime II LLC ("SM2," and together with SM1, the "SM Funds") arose from Oak Hill and KKR Alternative Debt's exercise of their right of first refusal in the SM1 LLC agreement.  (Toepfer Decl. ¶ 26)  Like SM1, SM2 is a direct lending fund providing loans to third parties for those third parties to finance shipping vessels.  (Toepfer Decl. ¶ 27)  SM2 closed on May 10, 2023.[4]  (*Id.* ¶ 28)

---

[4]  Given Judge Willis's decision granting Borealis's motion for a protective order (ECF No. 137), Borealis has not produced any documents relating to the SM Funds.  However, Borealis will produce the LLC Agreements for the SM Funds to the Court to corroborate the date that the SM Funds closed and the fact that the investors in the SM Funds are different than the investors in each of the EM Funds upon the Court's request.

# ARGUMENT

Summary judgment will be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The timeliness of claims is a particularly appropriate subject for summary judgment. *BellSouth Telcoms. v. W.R. Grace & Co.-Conn.*, 918 F. Supp. 533, 534 (D. Conn. 1994) ("Although the basic summary judgment principles govern, summary judgment may be particularly appropriate as to statute of limitations issues, since that defense often does not involve a genuine question of material fact. . . . This has been long recognized in the Second Circuit") (quotation and citations omitted).

Further, under New York law, "agreements negotiated at arm's length by sophisticated, counseled parties are generally enforced according to their plain language pursuant to our strong public policy favoring freedom of contract." *159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 356 (2019). "A reading of the contract should not render any portion meaningless," *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007); accordingly, "[c]ourts will give effect to the contract's language and the parties must live with the consequences of their agreement. If they are dissatisfied, the time to say so is at the bargaining table." *Eujoy Realty Corp. v. Van Wagner Commc'ns, LLC*, 22 N.Y.3d 413, 424 (2013) (quotation marks and alterations omitted).

## I. Borealis Is Entitled To Summary Judgment On ETG's Sole Breach Of Contract Claim

### A. ETG's Claim Is Time-Barred

ETG's Complaint pleads a single cause of action for breach of the RSA. In New York, the statute of limitation for breach of contract is six years. CPLR § 213(2). "As a general principle, the statute of limitations begins to run when a cause of action accrues (*see* CPLR

203[a]), that is, 'when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court[.]'" *Hahn Automotive Warehouse, Inc. v. American Zurich Ins. Co.*, 18 N.Y.3d 765, 770 (2012). "A cause of action for breach of contract ordinarily accrues . . . upon breach," and "[t]he plaintiff need not be aware of the breach or wrong to start the period running." *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) (citing *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402 (1993)). "This is true even when the alleged injury occurs after the breach itself." *Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A.*, 2014 WL 1259630, at *2 (S.D.N.Y. Mar. 27, 2014) (citing *Ely-Cruikshank Co.*, 81 N.Y.2d at 402); *see also T & N PLC v. Fred S. James & Co. of NY, Inc.*, 29 F.3d 57, 59 (2d Cir. 1994) ("[T]he [New York] Court of Appeals . . . has declined to adopt the accrual-at-injury rule, even where breach and damages are not simultaneous").

Under the RSA, Borealis's obligation to grant ETG certain interests was contingent on the occurrence of a future event, *i.e.*, Borealis obtaining a Financing.[5] Accordingly, "the Statute of Limitations began to run when that [contingent future event] was fulfilled." *Goldman*, 858 F. Supp. at 50; *see also Gil v. Gleitzman*, 2024 WL 901406, at *7 (Del. Ch. Mar. 4, 2024) (holding that claim for breach of agreement to assign patents not yet in existence accrued when patents were issued). Indeed, *Goldman* is directly on point. In *Goldman*, defendant Turner entered into the following agreement with plaintiff Goldman:

> This is to advise you of *when* I personally have a net worth of $400,000,000, which I anticipate will be in about four (4) years, *I will pay* in cashier's check to you the sum of $1,000,000, plus any increases for inflation according to the Consumers Index from October 1, 1978.

---

[5] As discussed *infra* at Part II(A), ETG's principal Chen admits that Borealis's obligation to perform "attached" when EM1, EM2 and EM3 "came into being" or came into "existence." (Chen Depo. Tr. at 100:23-102:3)

*Id.* at 49-50 (emphasis added).  Reading the agreement "in accordance with its plain meaning," the court held that "the promise to pay accrued and the Statute of Limitations began to run, no later than the first day upon which defendant reached that net worth amount, expiring six years thereafter." *Id.* at 50.  The Court also cited "plaintiff's own letter of congratulations sent in 1984" when Turner reached a net worth of $400 million as "an admission of fact on the part of plaintiff that defendant was then worth more than $400,000,000" and that put Goldman "on notice to assert his claim." *Id.*; *see also* RESTATEMENT (2D) OF CONTRACTS § 321(2) ("[A] purported assignment of a right expected to arise under a contract not in existence operates only as a promise to assign the right *when it arises* and as a power to enforce it") (emphasis added); 9 CORBIN ON CONTRACTS § 50.2.

Just like the agreement in *Goldman*, Paragraph (c) of the RSA states:  "*[i]n the event* Borealis obtains Financing," "Borealis *will grant* ETG [] a 7.5 % interest in the carried interest of Borealis . . . in investment(s) . . . made with the Financing; and [] the option, but not the obligation, to co-invest with Borealis in such investment(s)."  (RSA ¶ (c) (emphasis added)) Reading this language in accordance with its plain meaning, ETG's claims for breach of the RSA "accrued and the Statute of Limitations began to run, no later than the first day" when Borealis obtained a Financing, *i.e.*, on November 27, 2013 for EM1, and expired "six years thereafter" on November 27, 2019 – more than two years before ETG brought suit.[6]  *Goldman*, 858 F. Supp. at 50.  Even if EM2 and EM3 could be considered Financings under the RSA, which they are not, EM2 closed on October 6, 2014 and EM3 closed on August 3, 2015, also more than six years

---

[6]  ETG's Complaint itself recognizes this is the case.  ETG alleges that Borealis breached the RSA by "[f]ailing to advise ETG of co-investment opportunities to which ETG was entitled under the RSA *as those opportunities arose*."  (Am. Cmplt. ¶ 31(e) (emphasis added))

before ETG commenced this action on December 21, 2021.  (Borealis 56.1 Statement ¶¶ 16-18; ECF No. 207-1 ¶¶ 16-18)

Notably, like the plaintiff in *Goldman*, ETG sent emails congratulating Borealis when it closed EM1.  (Ruff Decl. Ex. W)  ETG's principal, Chen, also conceded knowledge of EM2 and EM3.  (Chen Depo. Tr. 60:9-22, 62:10-12)  As the *Goldman* court held, these are admissions of fact that ETG knew of EM1, EM2 and EM3 and that put ETG "on notice to assert [its] claims." *Goldman*, 858 F. Supp. at 50.  Here, the facts are even worse for ETG because in 2013, ETG's litigation counsel told ETG that it needed to make a demand on Borealis with respect to EM1. (*See* Ruff Decl. Exs. T, U)  However, ETG waited another eight years to file this action.  No material issue of disputed fact exists here, and ETG's claims are time-barred.

### B.    ETG Has No Standing To Bring Its Claim

Summary judgment should also be granted on ETG's breach of contract claim because, as pleaded, ETG lacks standing to bring it.  In all federal cases, the plaintiff must have Article III standing, which requires that "the plaintiff have legal title to, or a proprietary interest in, the claim." *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l*, 790 F.3d 411, 420 (2d Cir. 2015).  Additionally, in breach of contract cases, the plaintiff must also have "contractual standing, which asks a different question:  whether a party has the right to enforce a contract." *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020); *U.S. Bank Nat'l Ass'n as Tr. to Bank of Am., N.A. v. KeyBank, Nat'l Ass'n*, 2023 WL 2745210, at *16 (S.D.N.Y. Mar. 31, 2023) ("Contractual standing is a prudential limitation on the Court, rather than a constitutional one").

ETG's breach of contract claim alleges that Borealis (1) "fail[ed] to pay ETG 7.5% of the remuneration which it has received or is entitled to receive" and (2) "fail[ed] to provide ETG with the 7.5% co-investment opportunity in respect of all amounts invested by Borealis."  (Am.

Cmplt. ¶¶ 34-35)  ETG is suing as if the RSA actually granted ETG interests in future contingent

events.   But, of course, under fundamental contract law, it did not and could not.   ETG needed a

grant or an assignment of those interests when they arose, which ETG admits never occurred.

(Chen Depo. Tr. 55:19-56:5; 60:12-22; 62:13-63:2)  As the Appellate Division, First

Department, has held:

> The alleged fee-sharing agreement confirmed by Kaiser, which used the
> phraseology "I will pay" to plaintiff a percentage "of any monies that come into
> my hands by reason of my contingency fee arrangement" with the client, was a
> *future contingent promise to pay* that could give rise only to a breach of contract
> claim (*see, Clark v Robinson,* 252 App Div 857).  *It did not constitute an
> assignment of a portion of the client's recovery* (*see Leon v Martinez,* 84 NY2d
> 83, 88-89), or convey a present interest in any specific fund (*see, Donovan v
> Middlebrook,* 95 App Div 365; *Peters Griffin Woodward v WCSC, Inc.,* 88 AD2d
> 883).

*Kurzman Karelsen & Frank, LLP v. Kaiser*, 283 A.D.2d 330, 331-32 (1st Dep't 2001) (emphasis

added); *see also Leon*, 84 N.Y.2d at 88 (noting the "difference in legal effect between the words

'I will pay you a fee equal to one third of the amount collected from the defendant' and the

words 'I now *give* you a one third interest in the claim as your fee'" as the former is a "mere

promise" and the latter "seems to be an assignment"  (quoting 4 CORBIN ON CONTRACTS § 879));

*Liberty Life Assur. Co. of Bos. v. Gilbert*, 507 F.3d 952, 955-56, 958 (6th Cir. 2007) (applying

Virginia law – which is substantively similar to New York law on this issue – and finding that

where decedent and wife entered into a separation agreement obligating decedent "to pay certain

amounts to [wife] 'if and when I receive compensation,'" "no assignment occurred" because

decedent "merely promised to pay a sum of money to [wife], contingent on his receiving

compensation for his personal injury action," which "does not amount to an equitable

assignment").

In sum, ETG's claims against Borealis seek to enforce interests that it does not have. (Am. Cmplt. ¶¶ 34-35)  Although a party may enforce a right it has been assigned, where no assignment has occurred or the assignment is incomplete, the party lacks "legal title to, or a proprietary interest in," that right and thus lacks Article III standing to enforce it.  *See, e.g.*, *Cortlandt*, 790 F.3d at 424 (plaintiff lacked standing to enforce claims where it was not "assigned title to the claims" but "merely a power of attorney"); *In re Century/ML Cable Venture*, 311 F. App'x 455, 456 (2d Cir. 2009) (plaintiff "lacks standing" because "it has no legally protected interest because it never received a valid transfer of claim").  Likewise, in contract cases, where a party has not been assigned a contractual right, it also lacks contractual standing to enforce that right.  *Terry v. Charitable Donor Advised Fund, L.P.*, 2024 WL 382113, at *13 (S.D.N.Y. Feb. 1, 2024) (party without contractual rights "lacks standing to sue for breach absent a valid assignment of the claim"); *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 612 F. Supp. 3d 263, 278-79 (S.D.N.Y. 2020) ("Both Supreme Court and Second Circuit precedent indicate that the lack of valid assignments . . . would in fact deprive Plaintiffs of both Article III *and prudential standing*") (emphasis added).  Since no grant or assignment of the 7.5% interest in the carried interest or the co-investment option occurred, ETG lacks any "legal title to, or a proprietary interest in" those interests, and ETG lacks both Article III and contractual standing to enforce them.[7]

---

[7]  ETG also alleges that "Borealis has breached its contract with ETG by engaging in numerous acts that constitute a breach of the covenant of good faith and fair dealing."  (Am. Cmplt. ¶¶ 31, 33, 36)  To the extent ETG is asserting a separate cause of action for breach of the covenant of good faith and fair dealing, such a claim fails for the same reasons as ETG's breach of contract claim as it cannot overcome the limitations bar or ETG's standing issues.  An implied covenant claim must also be dismissed as ETG's allegations supportive of that claim are all duplicative of its express contract claim.  The allegations found in subparts (a)-(d) of paragraph 31 of ETG's Complaint are all duplicative of ETG's allegation that Borealis "failed to pay ETG 7.5%" of the

C.     **ETG's Claims For Compensation From EM2, EM3, SM1
       And SM2 Are Barred Under The Express Terms Of The RSA**

In addition to the deficiencies noted above, under established New York law, ETG's

claims for compensation from EM2, EM3, SM1, and SM2 must be dismissed for the independent

reason that ETG fails to establish a direct and proximate link between its introduction of Miller

Buckfire to Borealis and the EM2, EM3, SM1 and SM2 transactions.  Further, ETG now admits

that the RSA's definition of Financing is transaction- and not investor-based, and it offers no

evidence disputing the fact that EM2, EM3, SM1, SM2 are transactions separate and distinct

from EM1.

1.     **ETG Cannot Show The Necessary "Continuing
       Connection" Or A "Direct And Proximate Link"
       Between Its Miller Buckfire Introduction
       And The EM2, EM3, SM1 and SM2 Transactions**

It is undisputed that the RSA contains no express term granting ETG a right to

compensation in perpetuity, and it is black letter law in New York that contracts "do not confer a

right in perpetuity" in the absence of "*express language*" providing such a right.[8]  17 C.J.S.

---

carried interest.  The allegation found in subpart (e) is duplicative of ETG's allegation that
Borealis "failed to provide ETG with the co-investment opportunity."  Accordingly, as any
implied covenant claim alleged by ETG is "based on the same facts underlying the breach of
contract claim," the implied covenant claim should be dismissed as duplicative.  *Tour Cent. Park
Inc. v. Thor 38 Park Row LLC*, 223 A.D.3d 546, 547 (1st Dep't 2024); *Engelhard Corp. v. Rsch.
Corp.*, 268 A.D.2d 358, 358-59 (1st Dep't 2000) ("The cause of action for breach of the implied
covenant of good faith and fair dealing was properly dismissed as duplicative of the breach of
contract claim.").

[8]  It is unclear whether ETG is asserting that the RSA's scope extends to all KKR funds as it
states in its opening brief (ETG Br. at 10) or just to the EM and SM Funds as it states in its letter
opposing Borealis's letter motion for leave to file a motion for summary judgment (ECF No. 205
at 3-4)  However, as explained in this Part (and as detailed in Borealis's motion for a protective
order, ECF No. 64), the RSA cannot extend to all KKR funds because New York law does not
allow contracts to last in perpetuity without express language to the contrary.  *Boyle*, 481 F.
Supp. at 148.  ETG has also failed to state any reasonable basis for extending the scope of the
RSA to the SM Funds, only stating that KKR affiliates were one of two investors in those funds.

CONTRACTS § 608; *Boyle v. Readers' Subscription Inc.*, 481 F. Supp. 156, 158 (S.D.N.Y.), *aff'd*, 614 F.2d 1285 (2d Cir. 1979); *see also Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F. Supp. 655, 661 (S.D.N.Y. 1959) (noting "courts are loathe to find that the absence of a terminal point indicates an intention to contract for the indefinite future," and instead determine the "terminating date or condition" based on the circumstances surrounding the contract). The RSA was executed in 2012; ETG asks this Court to extend it to transactions that closed as far as eleven years later with no involvement of Miller Buckfire or ETG. There is simply no basis for doing so under New York law.

ETG contends it is entitled to compensation for EM2, EM3, SM1 and SM2 based on a mere "but for" contention: *but for* ETG's introduction of Miller Buckfire to Borealis, Borealis would not have met KKR and its affiliates, and the EM2, EM3, SM1 and SM2 transactions would not have occurred. ETG is wrong. New York law requires a "cause" which is "more than simply a necessary 'but for' condition." *Karelitz v. Damson Oil Corp.*, 820 F.2d 529, 531 (1st Cir. 1987).

> The causal relationship which must be shown between the introduction and the final transaction requires that the plaintiff "show more than that his service was a necessary condition. Rather, the finder must show that 'the deal that was made resulted and flowed directly from the original' introduction. He must establish a 'continuing connection' between the finder's service and the ultimate transaction."

---

(*See infra* at Part I(C)(2)) This is an insufficient causal connection as a matter of law. (*See infra* at 16-18) Also, what ETG refuses to say is whether it will also seek compensation if there is an SM3, SM4, or SM5 transaction. In short, when – according to ETG – does its right to compensation end?

*Rosenblatt v. Christie, Manson & Woods Ltd.,* 2005 WL 2649027, at \*9 (S.D.N.Y. Oct. 14,

2005), *aff'd*, 195 F. App'x 11 (2d Cir. 2006) (citations omitted);[9] *see also Ferghana Partners*

*Inc. v. Bioniche Life Sciences Inc.*, 2011 WL 5385096, at \*6 (Sup. Ct. N.Y. Cnty. 2011) ("A 'but

for' connection is not sufficient," and "finder must show that there is some continuing

connection, a continuity of negotiations, between the finder's initial efforts and the transaction

that came about").

Here, there was no direct link or continuing connection between ETG's introduction of

Miller Buckfire and the closing of EM2 and EM3 with KKR affiliates or the closing of SM1 and

SM2 with other KKR affiliates and Oak Hill.  (ECF No. 66, the "Buckfire Decl." ¶ 11; Toepfer

Decl. ¶ 16)  Indeed, it is undisputed that:  (a) EM2 and EM3 resulted from Borealis's successful

management of EM1 (Toepfer Decl. ¶ 17; Ruff Decl. Ex. X), (b) Borealis independently

marketed the idea for SM1 to several financial institutions years after EM1 closed, and (c) these

independent marketing efforts resulted in a successful deal with a KKR affiliate and Oak Hill.

(Toepfer Decl. ¶¶ 19-25);[10] *see, e.g.*, *Moore v. Sutton Res., Ltd.*, 1998 WL 67664, at \*4

---

[9]  *Rosenblatt* is particularly instructive here.  In that case, the plaintiff had introduced a jewelry
owner ("Seabra") to defendant auction house Christie, Manson & Woods Ltd. ("Christie's") in
1990 pursuant to a finder's fee contract.  2005 WL 2649027, at \*1.  Thirteen years later,
Christie's auctioned jewelry owned by a Seabra family member; however, the Court granted
Christie's motion for summary judgment, finding plaintiff's 1990 Seabra introduction too remote
to support a fee.  *Id.* at \*5-7.  Here, ETG introduced MB, not KKR, to Borealis; MB's
involvement ended in 2013; EM2 and EM3 involved different KKR affiliates than EM1; and
SM2 and SM3 involved yet another different KKR affiliate and another investor, Oak Hill.
(Borealis 56.1 Statement ¶¶ 7, 20, 26-30)  The remoteness of ETG's introduction is far greater
than that in *Rosenblatt*.

[10]  ETG's only response to the facts set forth in Mr. Toepfer's declaration about the SM Funds is
that Borealis approached Brian Dillard *at KKR* about a potential debt fund in 2013.  ETG does
not assert that it was involved with the debt fund idea, that it approached either Borealis or KKR
about the debt fund idea or that it had any material involvement in the negotiations that led to the
closing of the SM Funds in 2018 and 2023, respectively.  Rather, ETG admitted that it had

(S.D.N.Y. Feb. 18, 1998), *aff'd,* 165 F.3d 14 (2d Cir. 1998) (finding connection insufficient

where five years passed between the initial introduction and ultimate transaction); *Cato Cap.*

*LLC v. Hemispherx Biopharma, Inc.*, 70 F. Supp. 3d 607, 625 (D. Del. 2014), *aff'd,* 625 F.

App'x 108 (3d Cir. 2015) ("It would violate the terms of the Agreement and sheer common

sense for the court to award [the plaintiff] fees for investments that it had nothing to do with").

 In response to this black-letter law, ETG insists that it was not a "finder" but a broker, so

ETG argues that these principles should not apply.  (*See* ECF No. 82 at 9; ECF No. 205, at 4; *see*

*also* RSA ¶ (f))  Even ETG's principal, Chen, testified that in connection with the RSA, he acted

as a qualified representative of a broker/dealer.  (Chen Depo. Tr. 41:6-19)  Yet, "[b]rokers are

generally obligated to take *greater* involvement in concluding an agreement than finders in order

to earn a fee."  *Cap. Access Servs. Inc. v. Direct Source Seafood, LLC*, 2018 WL 3093967, at *5

(S.D.N.Y. June 22, 2018) (emphasis added), *aff'd,* 767 F. App'x 157 (2d Cir. 2019); *see also*

*Greene v. Hellman*, 51 N.Y.2d 197, 206 (1980) ("[T]he broker must be the *procuring cause . . . .*

[T]here must be a direct and proximate link, as distinguished from one that is indirect and

remote, between the bare introduction and the consummation") (emphasis added).

 To obtain a commission, a broker must "bring the parties together on the essential terms

of the transaction."  *Cap. Access Servs. Inc.,* 2018 WL 3093967, at *5.  Here, it is undisputed

that ETG did not assist in the negotiation or closing of EM2, EM3, SM1 or SM2, and thus, could

not have – as a matter of law – brought "the parties together on the essential terms of the[se]

transaction[s]."  (ETG RFAs at 3)  Accordingly, under New York law, ETG – as an admitted

representative of a broker/dealer – is not entitled to compensation for EM2, EM3, SM1 and SM2.

---

nothing to do with the SM Funds.  (ETG RFAs at 3)  ETG thus has not submitted anything that
would entitle it to compensation for the SM Funds (or EM2 or EM3) under New York law.

**2.    ETG's "Investor"-Based Interpretation Of The RSA
Is Factually Unsupported And Contradicted
By Its Own Agreed-Upon Contract Language**

In denying Borealis's motion to dismiss, the Court stated that it was "not clear" that in

the RSA, "the parties intended 'financing' to mean only that financing which was obtained

pursuant to and in the course of the CRA, particularly because ETG was not a party to the CRA

and the CRA could be modified or terminated without ETG's knowledge or consent." *Energy*

*Transportation Grp., Inc. v. Borealis Mar. Ltd.*, 2023 WL 2586141, at \*3 (S.D.N.Y. Mar. 20,

2023).  However, discovery in this action has resolved this lack of clarity.  ETG's principal,

Chen, has admitted that the term "Financing" in the RSA "relates to the definition of Financing

as presented in the [C]apital [R]aising [A]greement."  (Chen Depo. Tr. 24:2-6; *see also id.*

34:14-21), and that ETG received drafts of the CRA, was asked by Borealis for comments on the

CRA prior to its execution, and ultimately received an executed copy.  (*Id.* 44:2-19; Ruff Decl.

Ex. D; Borealis 56.1 Statement ¶ 3; ECF No. 207-1 ¶ 3)[11]

Chen further testified that the definition of "Financing"[12] is transaction-based, listing

various types of transactions, involving both equity and debt, as a qualified "Financing."  (Chen

Depo. Tr. 20:18-21:13, 24:7-19)  Specifically, Chen testified that "the activities described in the

---

[11]  Further, the RSA itself requires Borealis to notify ETG if "any changes are made to the
underlying agreements," which includes the CRA, "or if any further agreements are signed
relating to the work between Borealis and MB."  (RSA ¶ (d))  Chen also testified that he agreed
to all these terms by executing the RSA.  (Chen Depo. Tr. 48:23-25); *Paguay v. ESH Rest. Grp.
LLC*, 2024 WL 1376163, at \*4 (S.D.N.Y. Apr. 1, 2024) (when a party "signs or accepts a written
contract," there is "conclusive presumption of knowledge and assent [that] applies also to the
terms of a separate document that is incorporated into a contract by reference").

[12]  Financing is defined as "an issuance, sale or placement, through a rights offer or otherwise, of
the equity, equity-linked or debt securities, instruments, or obligations of the Company or any
loan or other financing with one or more lenders and/or investors (each such lender or investor,
an 'Investor')."  (CRA at 1-2)

definition of the term 'Financing' appear to be discrete transactions." (*Id.* 26:10-16)  Chen then

admitted that the "definition of Financing" was "[n]ot linked to any particular investor." (*Id.*

26:17-24).  In other words, a Financing is a transaction – whether an equity or debt transaction –

that is arranged by Miller Buckfire, and there is nothing in the definition of Financing that

creates a link to an investor.

It is undisputed that the only Financing arranged by Miller Buckfire was EM1, which

involved the November 2013 issuance and sale of equity in Embarcadero Maritime, LLC, a

Delaware limited liability company.  (Buckfire Decl. ¶¶ 11, 12; Ruff Decl. Ex. H, Toepfer Decl.

¶ 16)  Both Miller Buckfire *and* ETG (under the terms of its Borealis Agreement with Miller

Buckfire) received compensation only for EM1.  (*See supra* p. 6; Buckfire Decl. ¶ 12; Chen

Depo. Tr. 67:22-68:2)

EM2 involved the October 2014 issuance and sale of equity in Embarcadero Maritime II,

LLC, a separate and distinct Delaware limited liability company.  EM3 involved the August

2015 issuance and sale of equity in Embarcadero Maritime III LLC, also a separate and distinct

Delaware limited liability company.  SM1 involved the 2018 issuance of debt by another, distinct

Delaware limited liability company, and SM2 involved the 2023 issuance of debt by another

separate and distinct Delaware limited liability company.  (Toepfer Decl. ¶¶ 19-28)  Under the

plain terms of the RSA, EM2, EM3, SM1 and SM2 are not "Financings" because (1) they are

transactions separate and distinct from EM1, and (2) neither Miller Buckfire nor ETG assisted in

arranging any of them.  (*See* ETG Br. at 6-8)

Despite its admissions, ETG argues that the RSA should be interpreted to extend to any

"Investor" introduced by Miller Buckfire to Borealis as that term is defined in the CRA.  (ETG

Br. at 5, 8-10)  ETG then contends that EM1, EM2, EM3, SM1 and SM2 all involved the same

investor, KKR, and that the five separate transactions were just "tranches" of one big KKR transaction. ETG is wrong on all counts. In making this "Investor" contention at his deposition, Chen relied on Section 1(b) of the CRA, which is one of the bullet points outlining the "financial advisory and investment banking services" that Miller Buckfire would provide to Borealis under the CRA. (*See* Chen Depo. Tr. 124:22-127:14) Section 1(b) states that Miller Buckfire would:

> provide financial advice and assistance to the Company in structuring and effecting a Financing, identify potential Investors (as defined below) and, at the Company's request, contact such Investors[.]"

(CRA § 1(b)) This section *was not incorporated into the definition of Financing in the RSA* as Chen admits. (*See* Chen Depo. Tr. 124:22-127:15) Chen was well aware of the CRA (*see supra* at p. 4-5, Part II(C)(2); *see also* Chen Depo. Tr. 44:2-19; Ruff Decl. Exs. D, E; Borealis 56.1 Statement ¶ 3; ECF No. 207-1 ¶ 3) and could have insisted that the RSA include an investor-based definition of Financing or incorporate Section 1(b) of the CRA, but he admits that he did not. (*Id.*) Under New York law, he is now bound by the agreement he signed. *Eujoy Realty Corp.*, 22 N.Y.3d at 424 ("Courts will give effect to the contract's language and the parties must live with the consequences of their agreement.").

Undeterred, ETG now contends that because the CRA's definition of Financing ends with a reference to "Investor," it somehow incorporates Section 1(b). (ETG Br. at 5) Of course, no authority is cited for this act of interpretative fancy, and a single reference to "Investor" does not change the plain meaning of Financing in the CRA. Still, even if ETG were right, nothing changes. CRA § 1(b) states that Miller Buckfire will "provide financial advice and assistance to the Company [Borealis] in structuring and effecting a Financing, identify potential Investors (as defined below) and, at the Company's request, contact such Investors." (CRA at 1) It does not say that if Miller Buckfire identifies an Investor in a Financing that Miller Buckfire will be

compensated for every transaction involving that Investor, which is what it must say for ETG's interpretation to work.

Rather, the lettered points under paragraph 1 of the CRA were services that Miller Buckfire promised to provide for Borealis, *without compensation*:  no compensation arose until a Financing was actually executed.  (CRA ¶ 2(a))  Nevertheless, ETG would have this Court use a single word in the definition of Financing to drag Section 1(b) into that definition in order to create additional compensation for itself.  This is utter nonsense.  Miller Buckfire's promise to introduce potential Investors to Borealis does not morph the transaction-based definition of Financing into an investor-based definition of Financing.

ETG is also wrong that the EM and SM transactions all involved the same investor and were just "tranches" of one transaction.  Indeed, KKR was not an investor in any of the EM transactions; instead, the LLC agreements for these transactions indisputably show different KKR affiliates, with different investment purposes and objectives, were the investors.  EM1, EM2 and EM3 each involved:  (1) different equity issued by different LLCs, (2) different investors, (3) different investment amounts, (4) different structures, and (5) different shipping capital.  (Borealis 56.1 Statement ¶¶ 16-18)  Further, SM1 and SM2 involved:  (1) the issuance of debt, not equity, (2) to different investors, (3) for differing issuance amounts, related to (4) different shipping capital.  (Toepfer Decl. ¶¶ 19-28)  ETG was also well aware that it was due to Borealis's "success in finding attractive investment opportunities and ability to deploy capital" that KKR decided to further commit additional financing.  (*See supra* Part I(C)(1); Ruff Decl. Ex. X; Ruff Decl. Ex. Y, "Toepfer Depo. Tr." 104:2-105:9)  ETG asks this Court to rewrite not only the RSA but also all of the EM and SM LLC agreements in order to support its "all-is-one" contention.  It is axiomatic that a New York court will not do that.  *Maxine Co., Inc. v Brinks's*

*Global Servs. USA, Inc.*, 94 A.D.3d 53, 56 (1st Dep't 2012) (a court cannot "rewrite the terms of

an agreement under the guise of interpretation" (quotation omitted)).

There is no material issue of disputed fact that the RSA does not reach separate and

distinct transactions that were not arranged by Miller Buckfire and did not involve ETG,

including EM2, EM3, SM1 and SM2.  Accordingly, ETG's claim for a declaratory judgment

asking this Court to find that the RSA reaches these additional funds must be dismissed on

summary judgment.

**II.    ETG's Motion For Summary Judgment Should Be Denied**

**A.    ETG Fails To Demonstrate That Its
        Claim With Respect To EM1 Is Timely**

ETG has moved for partial summary judgment as to certain monies earned by Borealis on

the EM1 transaction.  (ETG Br. at 22-24)  As demonstrated above (*supra* at Part I(A)), this claim

is time-barred, and as demonstrated below, ETG's arguments to the contrary are baseless.[13]

In negotiating the RSA, ETG insisted that any compensation ETG received pursuant to

the RSA be paid to a broker-dealer with which it was registered, Trump Securities, LLC

("Trump Securities").  (Chen Depo. Tr. 40:7-41:19)  Accordingly, the RSA includes a provision

that makes it clear that by paying Trump Securities, Borealis was paying ETG:

> The parties understand and agree that all securities transactions effected by agents
> of ETG shall be effected by a U.S. registered securities broker-dealer with which
> Kimball Chen and Alex Evans, employees of ETG, are registered, and all success
> fees that would otherwise be owing to ETG hereunder on account of any
> securities transaction shall be owed and paid to such broker-dealer. *Payment of
> the agreed success fees by Borealis to the registered broker-dealer with respect to*

---

[13]  ETG's opening brief is a recitation of disputed (and in many instances, erroneous) facts (*see*
ETG Br. at 3-15) and as such, is certainly no basis for an award of summary judgment.
*Bankboston (Guernsey) Ltd. v. Schupak*, 2000 WL 423526, at *2 (S.D.N.Y. Apr. 18, 2000), *aff'd*,
4 F. App'x 87 (2d Cir. 2001) ("Disputed facts preclude summary judgment.").  Further, none of
these disputed facts is relevant to, nor saves ETG's claims from, the statute of limitations bar.

> *securities transactions shall fully discharge the obligation of Borealis to pay such success fees related to securities transactions to ETG hereunder.*

(RSA ¶ (f) (emphasis added))

By selectively quoting this provision, ETG suggests that it somehow turns a purported assignment of future rights – which, as discussed *supra* at Parts I(A) and I(B), is a mere promise to assign when the right arises – into an assignment of present interests in Financings that do not exist.  (ETG Br. at 24-27)  ETG cites no authority for this argument because it is directly contradicted by New York law.  As detailed *supra* at Part I(A), where, as here, a contractual obligation "depends on the happening of a contingent future event, . . . the Statute of Limitations began to run when that condition was fulfilled."  *Goldman*, 858 F.Supp. at 50; *see also Leon*, 84 N.Y.2d at 88 ("there is a difference in legal effect between the words 'I will pay you,'" which is "mere promise," and "I now *give* you," which "seems to be an assignment"); *Kurzman*, 283 A.D.2d at 330-31 ("future contingent promise to pay" percentage of contingency fee arrangement "did not constitute an assignment of a portion of the client's recovery or convey a present interest in any specific fund").  A sentence that makes clear that payment to a third party is payment to ETG does not, in any way, alter the basic terms of the RSA or turn future, non-existent contracts into existing contracts.

ETG also contends that no claim accrued against Borealis because no one knew whether EM1 would even make any carried interest.  (ETG Br. at 27-29)  In truth, and as outlined in the RSA, no one knew whether Borealis would ever obtain a Financing.  Of course, this is why – as set forth in the Restatement and adopted by New York courts – ETG's claim accrued if and when Borealis obtained a Financing, *i.e.*, when Borealis's obligation to grant ETG interests in that Financing arose.  (*See supra* at Part I(A))  In fact, ETG's principal Chen admits that:

> [T]he revenue sharing agreement contemplated the future and an obligation, which, if circumstances described in the revenue sharing agreement came to

24

> fruition in which they would have an obligation, those circumstances came to
> fruition and an obligation, therefore, attached.

(Chen Depo. Tr. 100:23-101:5; *see also id.* 101:13-102:3 ("[M]y interpretation of the nature of

EM I, EM II, and EM III is that the existence of them is – and their coming into being was

contemplated by the RSA, and the carry sharing obligation of Borealis attached to what came

into being."))  In other words, ETG admits that Borealis's contractual obligation to perform did

not "attach" until each of the EM Funds closed.  Under New York law, it is when that obligation

"attached" that ETG's breach of contract claim accrued.  *Goldman*, 858 F. Supp. at 50.

ETG also contends that its breach claim did not accrue until carried interest was earned in

EM1, but that contention is flatly contradicted by New York law, which holds that a breach of

contract claim accrues upon breach "even when the alleged injury occurs after the breach itself."

*Wells Fargo Bank, N.A.*, 2014 WL 1259630, at *2 (citing *Ely-Cruikshank Co.*, 81 N.Y.2d at

402); *see also T & N PLC*, 29 F.3d at 59 ("[T]he [New York] Court of Appeals . . . has declined

to adopt the accrual-at-injury rule, even where breach and damages are not simultaneous").[14]

Indeed, ETG's argument is similar to the plaintiff's argument in *Welwart v. Dataware*

*Electronics* that its cause of action accrued each time profits were diverted by defendants.  277

A.D.2d 372, 372 (2d Dep't 2000).  The Second Department rejected this argument, however,

holding that "the limitations period is measured from the date of the initial breach in 1981 when

the defendants allegedly deprived the plaintiff of his right to the shares and began diverting

---

[14] ETG makes this argument because it is clear from ETG's opening brief (ETG Br. at 1-3) and
its Amended Complaint (Am. Cmplt. ¶¶ 4, 14, 27) that ETG brought this lawsuit because it
recently discovered that Borealis may have made a handsome profit on the EM Funds.  In other
words, ETG waited until it believed that Borealis had made significant carried interest to bring
suit – despite the fact that ETG retained litigation counsel in *November 2013* in connection with
its dispute with Borealis over the scope of the RSA.  New York courts do not reward such
dilatory behavior.  (*See supra* at Part I(A))

profits, regardless of when the damages began to accrue." *Id.* (citing *Ely-Cruikshank Co.*, 81

N.Y.2d at 402; *Goldman*, 858 F. Supp. at 49; *City of New York v. Cotroneo Marino's United*

*Electric Co.*, 269 A.D.2d 154, 154 (1st Dep't 2000); *Rabouin v. Metropolitan Life Ins. Co.*, 182

Misc.2d 632, 638 (N.Y. Sup. Ct. 1999)).  Here also, the initial breach with respect to EM1 was

when EM1 closed and Borealis allegedly deprived ETG of its right to certain interests in EM1.[15]

Finally, ETG cites communications of prior counsel with the Court, none of which

waived a statute of limitations defense.[16]  (ETG Br. at 28)  Indeed, the first time Borealis was

required to assert the statute of limitations as a defense was in its answer, which it did.  (ECF No.

56)  The communications in question were related to Borealis's unsuccessful motion to dismiss;

at that juncture, a statute of limitations contention was not possible on the face of the Amended

Complaint.  Borealis lost its motion to dismiss arguments and preserved its limitation defense;

accordingly, even if the two positions can be viewed as inconsistent, that inconsistency has no

relevance here, *Stitching v. Schreiber*, 407 F. 3d 34, 45 (2d Cir. 2005), and prior counsel's

---

[15] ETG also cites an email from Borealis and argues that it somehow shows that Borealis was conceding that claims under the RSA did not accrue until some carried interest was ultimately received.  (ETG Br. at 19)  The email said nothing of the sort and simply stated an undeniable fact about carried interest:  ETG's "7.5% share in the carry will naturally only materialise on exit, which is anticipated to be a few years away."  (*Id.*)  Many assigned rights to payment do not materialize right away, and Borealis was not agreeing to toll the statute of limitation with respect to ETG's claims under the RSA.  Further, a subsequent email cannot amend previously unambiguous contract language, *Kocak v. Dargin*, 199 A.D.3d 456, 456 (1st Dep't 2021) ("Resort to extrinsic evidence is inappropriate . . . [if] the language of the contract is plain and unambiguous" (quotation omitted)), and it certainly cannot create a present contract when only future contracts were at issue.

[16]  Despite ETG's assertions otherwise (ETG Br. at 1, 16), Borealis has never admitted liability with respect to any of the Funds.  That Borealis's executives, in an abundance of caution, set aside monies to cover a possible judgment against Borealis or a settlement of this matter is no admission of liability.

comments cannot change the language of the RSA or what contracts existed when the RSA was executed.

**B.**   **ETG Impermissibly Seeks A Piecemeal Summary Judgment Ruling**

Finally, ETG's motion for summary judgment should be denied for the additional reason that ETG seeks summary judgment on just a piece of its claim related to EM1.  ETG contends that the carried interest paid to date on EM1 is approximately $3.7 million, and it asks the Court to award it 7.5 percent of that amount, or $270,750.  (ETG Br. at 3, 30)  However, ETG argues, and Borealis disputes, that other monies due under EM1 are also "carried interest."  For example, ETG argues that payments made to the Class C members in EM1 are carried interest when Borealis contends they are not.  ETG also claims that it is entitled to monies because it did not invest in ETG, and to exit fees earned by EM1 upon the sale of ships.  (*See, e.g.*, ECF No. 13 ¶¶ 9, 35)  Borealis contends that ETG is not entitled to any of these other monies.

It is axiomatic that relief under Rule 56 is not for the "piecemeal" resolution of issues in a case.  *See Goodrich v. Gonzalez*, 451 F. Supp. 747, 749 (E.D.N.Y. 1978) ("[C]onsideration of plaintiffs' first motion for partial summary judgment would contravene the policy of the courts of this Circuit to refrain from entertaining, under Rule 56, motions which seek the determination of issues 'which are not dispositive of any claim or part thereof'") (quotations omitted)); *United States v. Am. Int'l Grp., Inc.*, 1997 WL 66786, at *3 (S.D.N.Y. Feb. 14, 1997) (holding that a ruling on a non-dispositive issue would be "inappropriate"); *Doty v. Sun Life Assurance Co. of Canada*, 2009 WL 3046955, at *1 (S.D. Tex. July 30, 2009) (recognizing that plaintiff sought summary judgment of two elements of her misrepresentation claim, but concluding that such a piecemeal approach to summary judgment is improper and noting "[t]he vast majority of cases . . . hold that Rule 56 does not contemplate partial summary judgment as to portions of a single claim" (citations omitted)); *Arado v. General Fire Extinguisher Corp.*, 626 F. Supp. 506,

509 (N.D. Ill. 1985) ("As this Court has often repeated . . . Rules 56(a) and 56(b) simply do not permit the piecemealing of a single claim or the type of issue-narrowing sought here."). Since other disputed issues exist as to EM1, resolution of ETG's claims as to that transaction should await trial. Alternatively, all issues as to EM1 should be resolved in Borealis's favor, as discussed herein.

## <u>CONCLUSION</u>

For all the reasons set forth above, Borealis's motion for summary judgment should be granted, and ETG's motion for partial summary judgment should be denied.

Dated: New York, New York
September 5, 2024

Respectfully Submitted,

BOIES SCHILLER FLEXNER LLP


/s/  *Jenny H. Kim*
Jenny H. Kim
Lindsey Ruff
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2354
E-mail: jkim@bsfllp.com

*Counsel for Defendant Borealis Maritime Limited*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing Memorandum of Law in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment was served on September 5, 2024, via the Court's CM/ECF electronic filing system addressed to all parties on the e-service list.


 /s/ *Jenny H. Kim*                          
Jenny H. Kim