UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ENERGY TRANSPORTATION GROUP, INC.,

                                Plaintiff,

                -against-

BOREALIS MARITIME LIMITED,

                                Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  _8/7/2025__

21 Civ. 10969 (AT) (JW)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Energy Transportation Group, Inc. ("ETG"), brings this action against

Defendant, Borealis Maritime Limited ("Borealis"), for breach of a revenue sharing agreement.

*See generally* Am. Compl., ECF No. 13.  Before the Court are ETG's motion for partial

summary judgment, ECF No. 216, Borealis' motion for summary judgment, ECF No. 224,

ETG's objections under Federal Rule of Civil Procedure 72(a) to certain pretrial rulings by the

Honorable Jennifer E. Willis, ECF Nos. 138, 157, four letter motions to seal documents

submitted in connection with the parties' cross-motions for summary judgment, ECF Nos. 206,

223, 243, 254, and one sealing request made by non-party Miller Buckfire & Co., LLC ("Miller

Buckfire" or "MB"), ECF No. 251.  For the reasons stated below, ETG's motion for partial

summary judgment is GRANTED; Borealis' motion for summary judgment is DENIED; ETG's

objections are OVERRULED AS MOOT; Borealis' sealing requests are GRANTED IN PART

and DENIED IN PART; and Miller Buckfire's sealing request is GRANTED.

# BACKGROUND[1]

I.    <u>Factual Background</u>

A.  The Capital Raising Agreement

In 2011, Ken Buckfire, co-founder and president of investment banking firm Miller Buckfire, reached out to Kimball Chen, chairman and principal shareholder of global shipping company ETG, to ask whether Chen had contacts who could help Miller Buckfire find investment and restructuring opportunities in the shipping industry.  Chen Dep. at 6:2–3, 7:5–9, 13:7–21, ECF No. 231-1.  Chen contacted a family friend, Christoph Toepfer, founder and chief executive officer of Borealis, to see if Borealis would be interested in working with Miller Buckfire.  *Id.* at 13:25–14:10; Toepfer Dep. at 9:22–25, ECF No. 231-9.  Toepfer expressed interest in the opportunity and sent his resume and a blurb about Borealis to Chen for his feedback.  Chen Dep. at 16:18–23; Toepfer Dep. at 20:18–21:4.  Chen then introduced the representatives of Miller Buckfire and Borealis, and the three organizations began discussing the development of a formal relationship between Borealis and Miller Buckfire.  Chen Dep. at 16:18–17:4; Toepfer Dep. at 20:9–17.

At the time, in late 2011, Borealis was a relatively new and small company, with about five employees and around $35 million in equity to invest in the global maritime shipping industry, which Borealis had raised from "family offices."  ECF No. 220-62; Toepfer Decl. ¶ 2, ECF No. 65; ECF No. 220-80 at 3; ECF No. 220-82 at 3.[2]  Borealis told Miller Buckfire that it could help find opportunities for the investment firm to advise shipping companies on

---

[1] These facts are taken from the parties' Rule 56.1 statements, the opposing party's responses, and the parties' declarations and accompanying exhibits, unless otherwise noted.  Citations to a paragraph of a party's Rule 56.1 statement include the other party's response.

[2] Unless otherwise noted, all citations to the exhibits at ECF No. 220 are to the ECF page number.

restructuring and solvency issues. Toeper Dep. at 25:20–26:8. Borealis also communicated to Miller Buckfire that it wanted Miller Buckfire's help raising capital for its own business. *Id.* at 26:9–18. Miller Buckfire told Borealis that it had a deep network within the private equity and investor community, and it offered to help Borealis raise capital that Borealis could invest in global shipping initiatives. *Id.* at 26:19–27:8.

These conversations resulted in two agreements between Borealis and Miller Buckfire: a "Finders Agreement," ECF No. 220-19, and a "Capital Raising Agreement" (the "CRA"), ECF No. 220-18, both dated April 2, 2012. Under the Finders Agreement, Borealis agreed to "assist Miller Buckfire in marketing Miller Buckfire's financial advisory services to the global maritime shipping community, including identifying potential clients, arranging meetings with potential clients and/or investors, and assisting in the preparation of targeted marketing materials." Finders Agreement at 2. In exchange, Borealis was entitled to a cut of the fees received by Miller Buckfire in connection with "restructuring financial advisory" opportunities "introduced to Miller Buckfire by Borealis or in respect of which Borealis was actively involved." *Id.*

Under the CRA, Borealis "engaged Miller Buckfire . . . as its financial advisor and investment banker with respect to a possible Financing." CRA at 2. The CRA defined "Financing" as "an issuance, sale[,] or placement, through a rights offer or otherwise, of the equity, equity-linked or debt securities, instruments[,] or obligations of [Borealis] or any loan or other financing with one or more lenders and/or investors (each such lender or investor, an 'Investor')." *Id.* at 2–3. Under the CRA, Miller Buckfire agreed to "provide financial advice and assistance to [Borealis] in structuring and effecting a Financing, identify potential Investors[,] . . . and, at [Borealis'] request, contact such Investors." *Id.* at 2. Like the Finders Agreement, the CRA included a formula for Miller Buckfire to be compensated in connection

3

with "any Financing" or "one or more Financings" consummated during the agreement period. *Id.* at 3–4.

B. The Revenue Sharing Agreement

While negotiating the CRA with Miller Buckfire, Borealis' Toepfer sent draft versions of the agreement to ETG's Chen for his review and input.  Toepfer Decl. ¶ 5.  On the day the CRA was finalized between Borealis and Miller Buckfire, Chen emailed Toepfer a proposal for ETG to share in the "distributions . . . received by [Borealis], relating to investments capitalized by Financings arranged or introduced by MB."  ECF No. 65-4 at 4.

Four months later, in August 2012, Borealis and ETG entered into a "Revenue Sharing Agreement" (the "RSA").  RSA at 2, ECF No. 220-17.  In the RSA's "Whereas" clauses, the parties wrote that "ETG has provided Borealis with an introduction to Miller[]Buckfire" and, "[f]ollowing the introduction to MB by ETG, Borealis signed a Finders Agreement . . . with MB to assist MB in securing shipping restructuring mandates," and "Borealis further signed [the CRA] with MB for MB to assist Borealis in raising capital for shipping investments."  RSA ¶¶ (1)–(3).  The parties agreed that, "[i]n the event Borealis obtains Financing (as defined in the [CRA]), Borealis will grant ETG . . . a 7.5% interest in the carried interest of Borealis (or any other related Borealis entity) in investment(s) . . . made with the Financing."[3]  *Id.* ¶ (c).  They further provided that ETG would receive a 25% cut of payments made to Borealis under the Finders Agreement, and that, for a 12-month period following execution of the RSA, ETG would

---

[3] The parties and witnesses in this case have used varying, overlapping definitions of the term "carried interest" (sometimes called "carry") throughout the litigation.  Because the term is not at issue here, the Court invokes a definition it previously relied upon: "'Carried interest' refers to the economic benefits, including performance-related remuneration, realized by Borealis and related entities" with "Financing," "excluding management fees designed to reimburse Borealis for operational and overhead costs."  MTD Order at 2, ECF No. 50.  The Court cites this definition without prejudice to either party litigating the meaning or scope of the RSA's "carried interest" provision at trial.

advise "Borealis regarding the services to be provided to MB pursuant to the [CRA]," if requested by Borealis. *Id.* ¶¶ (a)–(b).

### C. The Embarcadero Maritime Funds

From 2012 to 2013, Miller Buckfire introduced Borealis to more than 40 potential investors, including the global investment firm Kohlberg Kravis Roberts & Co. Inc ("KKR"). ETG 56.1 ¶ 8, ECF No. 217.  At least one of those introductions paid off:  In November 2013, Borealis, KKR, and other related entities executed an agreement to form a limited liability company known as Embarcadero Maritime, LLC ("EM I").  *Id.* ¶ 9.  Through EM I, KKR provided $100 million for Borealis to invest in maritime assets.  Toepfer Dep. at 47:23–48:11; Toepfer Decl. ¶ 13.  Less than a year later, in October 2014, Borealis- and KKR-related entities formed Embarcadero Maritime II, LLC ("EM II"), through which KKR invested an additional $100 million.  ETG 56.1 ¶ 11; Toepfer Dep. at 48:17–49:7.  In August 2015, Borealis- and KKR-related entities formed Embarcadero Maritime III, LLC ("EM III"), through which KKR invested yet another $200 million, bringing the total investment by KKR-affiliated entities to $400 million across the three EM funds.  ETG 56.1 ¶ 11; *see* Toepfer Dep. at 49:8–16; ECF No. 220-62.

### D. The Stanley Maritime Funds

In October 2018, three years after the last EM fund was launched, Borealis, a KKR-related entity, and a third party closed another fund, known as Stanley Maritime LLC ("SM I").  Borealis 56.1 ¶ E.2, ECF No. 241.  Whereas the EM funds were intended to be used to purchase and manage shipping vessels, SM I was designed as a "direct lending" fund to make loans to other shipping companies.  *Id.* ¶¶ E.1–2.  KKR and the third party that invested in SM I later exercised their rights of first refusal within the SM I agreement to form Stanley Maritime II

LLC ("SM II"), which closed in May 2023, to provide further capital to Borealis for direct-lending purposes.  *Id.* ¶¶ E.3–5.

II.    Procedural History

ETG commenced this action on December 21, 2021, alleging that Borealis breached the RSA by failing to pay ETG its portion of the carried interest generated on the "Financing" Borealis received from KKR.  *See generally* Compl., ECF No. 1.

Shortly after filing the lawsuit, ETG amended its complaint, Am. Compl., and Borealis moved to dismiss, ECF No. 22.  The Court denied Borealis' motion in March 2023.  MTD Order, ECF No. 50.  Borealis argued in its motion that the RSA limits ETG's compensation to carried interest generated from investments that Miller Buckfire specifically arranged.  *Id.* at 5. According to Borealis, because Miller Buckfire was directly involved only in EM I and was not involved in the subsequent Borealis-KKR funds, ETG's claim for carried interest derived from those funds fails as a matter of law.  *See id.*  The Court rejected that argument, concluding that the RSA's definition of "Financing" is ambiguous on its face and "can fairly be read to support" ETG's view that it is entitled "to carried interest based on financing provided by KKR," not just financing that Miller Buckfire specifically arranged.  *Id.* at 5–7.  Because "the language of the RSA is ambiguous," the Court held that "its construction present[ed] a factual question that preclude[d] dismissal on a Rule 12(b)(6) motion."  *Id.* at 6.

In June 2023, Borealis moved for a protective order that would limit the scope of discovery to the EM funds, arguing that any discovery related to other funds (such as SM I and SM II) would be irrelevant and disproportionate to the needs of the case.  ECF No. 63; ECF No. 64 at 1, 4.  In its opposition, ETG attached a draft agreement between ETG and Borealis from 2018 as well as email communications between the parties from 2020 that ETG contended

supported the need for discovery related to SM I and SM II.  *See* ECF No. 72.  Borealis moved to strike the exhibits, arguing that they constitute settlement communications that may not be used as evidence of liability.  *See* ECF Nos. 109–10.

By order dated December 18, 2023, Judge Willis granted Borealis' motion for a protective order and denied its motion to strike.  *See generally* Protective Order, ECF No. 137. Judge Willis allowed the 2018 draft agreement and 2020 email communications to be filed under seal but denied Borealis' motion to strike the materials, concluding that it would be premature at the discovery stage to decide whether they constituted settlement communications within the scope of Federal Rule of Evidence 408.  *Id.* at 10, 13.  Judge Willis further determined that any discovery on SM I and SM II would be unduly burdensome unless and until the Court issued "a dispositive ruling that the scope of the RSA does cover such funds."  *Id.* at 15.  Judge Willis thus entered a temporary protective order prohibiting discovery as to any funds beyond EM I, EM II, and EM III.  *Id.*

ETG objected to the Protective Order under Rule 72(a), arguing in sum and substance that it could not obtain a "dispositive ruling that the scope of the RSA does cover [SM I and SM II]" without first obtaining discovery related to those funds.  *Id.*; *see generally* ECF No. 138.  It also filed a motion for reconsideration, raising largely the same arguments before Judge Willis. ECF No. 139.  By order dated March 22, 2024, Judge Willis denied the motion for reconsideration.  Reconsideration Order, ECF No. 150.  In the Reconsideration Order, Judge Willis clarified that the Protective Order was intended to protect against discovery of information regarding KKR-Borealis funds beyond the EM funds until after a "ruling that the scope of the RSA *could* cover such funds."  *Id.* at 5 (alteration adopted) (emphasis in original).  ETG objected to the Reconsideration Order under Rule 72(a), arguing again that "[t]he blanket denial of all

discovery relating to the SM [f]unds will severely handicap ETG's ability to fairly oppose a summary judgment motion by Borealis" related to those funds.  ECF No. 157 at 3.

ETG then filed its motion for partial summary judgment, ECF No. 216, and Borealis filed its cross-motion, ECF No. 224.  Before the Court are the parties' cross-motions, ETG's Rule 72(a) objections to the Protective Order and Reconsideration Order, and various motions to seal or redact documents filed in connection with summary judgment.

## DISCUSSION

I.    <u>Summary Judgment</u>

A.  Legal Standard

A party is entitled to summary judgment if it can establish that there "is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record.  Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).  In making this showing, the party may rely on "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  If the moving party meets its initial burden, the burden shifts to the opposing party to establish a genuine dispute of material fact.  *Beard v. Banks*, 548 U.S. 521, 529 (2006).  The

Court views all facts "in the light most favorable to the non-movant, resolving all ambiguities in her favor." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

### B. The First Embarcadero Fund

ETG argues that it is entitled to summary judgment as to liability, and partial summary judgment as to damages, with respect to carried interest generated by EM I. It contends that there is no dispute that EM I is a "Financing" under the RSA, that EM I has generated carried interest, and that Borealis has failed to pay ETG any portion of that interest and, therefore, has breached the RSA. *See* ECF No. 218 at 1, 5. As for damages, ETG contends that, although the parties dispute the *extent* of the carried interest that Borealis-related entities have earned on EM I, there is no dispute that, at the very least, the money that the parties describe as "Class D distributions" is "carried interest" within the scope of the RSA. *Id.* at 9. ETG therefore claims that it is entitled as a matter of law to 7.5% of the Class D distributions of EM I, without prejudice to arguing at trial that it has sustained additional damages beyond those distributions. *Id.* at 10.

Borealis raises three arguments in opposition, none of which has merit. First, Borealis argues that ETG's claim is untimely. ECF No. 225 at 9. According to Borealis, ETG's breach-of-contract claim first accrued when Borealis closed the EM I "Financing" deal with KKR in November 2013. ECF No. 225 at 2, 10. Although no carried interest existed in November 2013 (and may have never come to exist if the investment fund had not performed well), Borealis argues that the RSA obligated ETG to preserve its claim to carried interest at the outset of the "Financing" by demanding an "assignment" of interest from Borealis. *Id.* at 13.

Because ETG did not do so, and because New York's statute of limitations for breach of contract is six years, *see* N.Y. C.P.L.R. § 213(2), in Borealis' view, ETG's claim is time-barred.[4]

Borealis misreads the terms of the RSA. Recognizing that carried interest is contingent on investment performance, the agreement unambiguously provides that "Borealis *will* grant ETG . . . a 7.5% interest in the carried interest of Borealis . . . in investment(s) . . . made with the Financing." RSA at 1 (emphasis added). The agreement does not require ETG to demand an assignment of carried interest; ETG is explicitly entitled to its portion of the carried interest that is generated. Borealis is correct that its "obligation to pay" ETG a percentage of carried interest "depends on the happening of a contingent future event," but it is wrong to limit that contingency to the mere securing of a "Financing." ECF No. 225 at 2 (quoting *Goldman v. Turner*, 858 F. Supp. 49, 50 (S.D.N.Y. 1994), *aff'd*, 50 F.3d 2 (2d Cir. 1995)). To trigger its duty to perform under the RSA, Borealis needed to both secure a "Financing" and generate carried interest on that investment. Even if Borealis' obligation to pay ETG a portion of Borealis' carried interest arose upon securing a "Financing," as Borealis contends, it could not have *breached* that obligation until it accrued carried interest and refused to share it with ETG. As Borealis recognizes in its briefing, the rule in New York, as elsewhere, is that the statute of limitations begins to run when the contractual obligation is breached, not when the obligation first arises. *Eli-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402 (1993). Because the parties agree that Borealis did not accrue carried interest until a date within the limitations period of this

---

[4] Borealis raises this argument for the first time at summary judgment after previously arguing the opposite in its motion to dismiss. There, Borealis argued that ETG made its breach-of-contract claim too *early*—that is, that ETG could not sue for carried interest because none had yet to accrue on the EM funds when ETG filed its suit. ECF No. 27 at 9–10. ETG argues that Borealis should be judicially estopped from changing its litigation position in this manner, and that its new timeliness arguments should, therefore, be disregarded. ECF No. 218 at 29 (citing *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014)). The Court does not reach this issue because, as explained below, Borealis' newly invented timeliness argument fails on the merits.

action, and Borealis has never paid ETG any portion of that interest, ETG's suit is not time-barred.

Borealis makes a similar argument that ETG lacks "standing" to sue for breach of contract because it never demanded an assignment of carried interest on any "Financing" Borealis may have received. ECF No. 225 at 12–13. Again, this argument is foreclosed by the plain text of the RSA, which references neither an assignment nor any requirement that ETG demand one. The RSA unambiguously obligates Borealis to pay ETG 7.5% of any carried interest generated by a "Financing," and it would not be reasonable to read the agreement to require ETG to demand that to which it is already entitled under the agreement's plain terms. *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) ("Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." (citation omitted)); *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985) ("[A]n interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect."). The principal case relied upon by Borealis, *Kurzman Karelsen & Frank, L.L.P. v. Kaiser*, in which the court found that a broken promise to pay that had been based on a future contingency "could give rise . . . to a breach of contract claim," bolsters the Court's conclusion. 283 A.D.2d 330, 330–31 (N.Y. App. Div. 2001).

Finally, Borealis contends that ETG's motion is improper because it seeks to achieve only a piecemeal resolution of issues at stake in the litigation. ECF No. 225 at 27–28. Federal Rule of Civil Procedure 56 was amended in 2010 to make clear that a party may seek summary judgment as to any "part of [a] claim or defense." Fed. R. Civ. P. 56(a) & Advisory

Committee's note to 2010 amendment ("[S]ummary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense."). Each of the cases Borealis relies upon predates the rule change. *See* ECF No. 225 at 227–28. Even if they did not, the cases would be inapposite. They stand for the uncontroversial proposition that Rule 56 may not always be the proper vehicle for a court to adjudicate non-dispositive matters or to resolve only certain elements of a complete claim. *See, e.g.*, *Goodrich v. Gonzalez*, 451 F. Supp. 747, 749 (E.D.N.Y. 1978); *Doty v. Sun Life Assurance Co. of Canada*, No. 07 Civ. 3782, 2009 WL 3046955, at *1 (S.D. Tex. July 30, 2009). But, as concerns Class D distributions from EM I, Borealis' motion is dispositive and touches on each element of breach of contract, from formation through damages. Accordingly, ETG's motion is procedurally proper.

Ultimately, Borealis does not dispute that, if the Court finds ETG's claim to be both timely and procedurally sound, ETG is entitled to summary judgment as to the Class D distributions from EM I.[5] *See, e.g.*, ECF No. 225 at 2, 20 (Borealis acknowledging that it is "undisputed" that EM I was a "Financing" under the RSA); ECF No. 23 at 1 (same, noting that "ETG is . . . entitled to carried interest from EM I"); ETG 56.1 ¶ 13 (showing no dispute among the parties that Class D distributions from EM I, EM II, and EM III qualify as "carried interest" under the RSA). ETG's motion for partial summary judgment is, therefore, granted.

### C. The Second and Third Embarcadero Funds

The Court next addresses Borealis' motion for summary judgment as to EM II and EM III.

---

[5] Borealis argues, and ETG does not dispute, that to the extent ETG makes a separate claim for breach of the implied covenant of good faith and fair dealing, *see* Am. Compl. ¶¶ 31, 36, that claim should be dismissed as duplicative of ETG's breach of contract claim, ECF No. 225 at 14 n.7; *see generally* ECF No. 237. The Court agrees and dismisses ETG's claim, if any, for breach of the implied covenant of good faith and fair dealing.

1. The Meaning of "Financing" under the RSA

In support of its motion, Borealis returns to an argument it made at the motion-to-dismiss stage. It argues that the RSA is nothing more than a finder's agreement crafted to compensate ETG based on the value of investments made or raised by Miller Buckfire. *See* ECF No. 225 at 16–17. Courts applying New York law typically construe such agreements to limit a finder's compensation to transactions that "result[] and flow[] directly from the original introduction" by the finder, such that there must be a "continuing connection between the finder's service and the ultimate transaction" for the finder to be paid. *Rosenblatt v. Christie, Manson & Woods Ltd.*, No. 04 Civ. 4205, 2005 WL 2649027, at *6, *9 (S.D.N.Y. Oct. 14, 2005) (citations omitted). Borealis contends that ETG, as the "finder" of Miller Buckfire, may only take a cut from the carried interest generated by investments that were arranged specifically by Miller Buckfire, because only those transactions could be said to "result and flow directly from" ETG's introduction of Miller Buckfire and Borealis. *Id.*; *see* ECF No. 225 at 20. And because, according to Borealis, Miller Buckfire had "no involvement" in the negotiation and closing of EM II and EM III, ETG is not entitled to receive compensation derived from those funds. ECF No. 225 at 16; *see id.* at 20.

The Court has already held that the text of the RSA supports multiple reasonable constructions, including one in which ETG is entitled to receive carried interest derived from KKR-related transactions that Miller Buckfire did not specifically arrange. *See* MTD Order at 5–6. Accordingly, for its interpretation of the RSA to succeed at summary judgment, Borealis must show that the extrinsic evidence now before the Court "is so one-sided that no reasonable person could decide to the contrary," or that ETG has failed entirely "to point to any relevant extrinsic evidence supporting [its] interpretation" of the RSA. *Phoenix Ins. Co. v. Hudson*

*Excess Ins. Co.*, No. 21 Civ. 4474, 2023 WL 5048629, at *11 (S.D.N.Y. Aug. 8, 2023) (alteration adopted) (citations omitted).  If Borealis cannot do so, then the scope of the agreement must be decided by the factfinder at trial.

The Court agrees with ETG that Borealis has not met its high burden.  Borealis has identified extrinsic evidence that it claims supports its construction of the RSA.  *See, e.g.*, ECF No. 225 at 19–20; Borealis 56.1 ¶ 10.  For example, it points to an email Toepfer sent Chen in November 2013, a little over a year after the RSA was executed, in which Toepfer stated that he had "expected a closer cooperation and involvement by [ETG] in [Borealis'] not insignificant efforts to raise capital, which formed the basis for the agreement to share 7.5% of the carry with [ETG]."  ECF No. 220-35 at 5.  It also points to evidence indicating that, if its construction is adopted and the RSA is understood to compensate ETG only for transactions specifically arranged by Miller Buckfire, no transaction other than EM I would fall within the scope of that agreement.  ECF No. 225 at 19–23.

But the evidence is not entirely one-sided.  In its opposition, ETG advances the same construction of the RSA that the Court has already found to be a fair and reasonable reading of the agreement, now with extrinsic evidence to support it.  ETG reads the RSA to link its compensation for introducing Borealis to Miller Buckfire to the CRA's definition of "Financing"— the same term that governed Miller Buckfire's compensation for acting as Borealis' finder of capital.  *See* ECF No. 237 at 12–13.  Specifically, the RSA provides that, "[i]n the event Borealis obtains a Financing *(as defined in the [CRA])*, Borealis will grant ETG . . . a 7.5% interest in the carried interest of Borealis . . . in investment(s) . . . made with the Financing."  RSA at 1 (emphasis added).  The CRA, in turn, defines a "Financing" as "an issuance, sale[,] or placement . . . of the equity . . . or obligations of [Borealis] or any loan or

other financing with one or more lenders and/or investors (each such lender or investor, an

'Investor')." CRA at 2–3. The CRA further states that Miller Buckfire will "provide financial

advice and assistance to [Borealis] in structuring and effecting a Financing, identify potential

Investors[,] . . . and, at [Borealis'] request, contact such Investors." *Id.* at 2.

Reading the two agreements together, ETG argues that the RSA was designed to reward

one entity, ETG, for finding or brokering a relationship with another entity, Miller Buckfire,

whom Borealis retained to act as a finder of capital. Because Miller Buckfire is itself a finder,

ETG's reward is tied to Miller Buckfire's success, if any, in introducing investors to Borealis and

Borealis' success, if any, in managing investments facilitated by those efforts. ECF No. 237 at

13. Provided a transaction is an investment in equity or debt by "an Investor whom Miller

Buckfire had identified and contacted" on Borealis' behalf, and the transaction results in carried

interest for Borealis, ETG believes that it is entitled to 7.5% of that interest under the RSA. *Id.*

Under this view, ETG need not be involved in, and Miller Buckfire need not specifically arrange,

a transaction for the transaction to qualify as a "Financing" and generate a possible fee for ETG.

*See id.* at 12–13. All that matters is that the finder whom ETG found for Borealis ends up

facilitating an investor relationship that pays off for Borealis.

Borealis claims that there is "no basis" for such an agreement "under New York law."

ECF No. 225 at 16. But New York law is clear that parties may, "in certain circumstances, reach

a specific understanding that a finder's commission will be payable even if the finder's efforts

are not a direct or procuring cause of acquisition." *Barrister Referrals, Ltd. v. Windels, Marx,*

*Davies & Ives, Esqs.*, 564 N.Y.S.2d 759, 760 (App. Div. 1991). ETG argues that, by tying

ETG's compensation to Miller Buckfire's success as a finder for Borealis, the RSA reflected a

specific understanding that ETG could be paid even if its efforts were "not a direct or procuring

cause" of a transaction facilitated by Miller Buckfire.  *Id.*  Such an agreement may or may not be typical, but "[a]bsent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish."  *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 67–68 (1978).

Borealis suggests that ETG's reading of the RSA would violate public policy because it would allow ETG to receive a cut of Borealis' carried interest on investments in perpetuity, so long as the investor is one whom Miller Buckfire introduced to Borealis.  *See* ECF No. 225 at 21–22.  ETG does not read the agreement so broadly.  It agrees that the RSA must be construed to contain an implicit limitation, or a set of acts or conditions, that would automatically terminate the agreement after a reasonable period of time.  ECF No. 237 at 25–27.  It also does not dispute that the proximate-cause rules articulated in *Rosenblatt* would apply to the CRA between Miller Buckfire and Borealis.  *See* 2005 WL 2649027, at *6.  In other words, ETG does not dispute that, to qualify as a "Financing" under both the CRA and the RSA, an investment would have to "result[] and flow[] directly from [an] original introduction" by Miller Buckfire such that there is a "continuing connection between [Miller Buckfire's] service and the ultimate transaction."  *Id.* at *6, *9 (citations omitted).  Under this view, Miller Buckfire need not have specifically arranged the investment, but its efforts must at least be proximately related to the transaction for it to qualify as a "Financing" and trigger ETG's possible compensation.  Such an arrangement would not, on its face, violate New York law or transgress a strong public policy.

### 2.  Extrinsic Evidence

Extrinsic evidence supports ETG's interpretation of the RSA.  There is evidence, for example, that the parties did not intend the RSA to require ETG to be involved in any "Financing" in which Miller Buckfire was involved to receive compensation.  The RSA was

executed after ETG had already introduced Borealis to Miller Buckfire and Miller Buckfire had

agreed to act as a financial advisor/finder of capital for Borealis.  ECF No. 237 at 10.  ETG and

Borealis made note of this fact in the RSA's "Whereas" clauses, attached the CRA to the RSA as

an exhibit, and incorporated by reference Miller Buckfire and Borealis' definition of "Financing"

from the CRA.  *See* RSA; ECF No. 237 at 10.  The only continuing obligation the RSA imposed

on ETG was to advise Borealis on the services Borealis agreed to provide Miller Buckfire under

the CRA, if requested by Borealis, for a period of twelve months following the execution of the

RSA, and the parties do not dispute that Borealis never requested such advice.  RSA ¶ (a).

Together, these facts suggest that the main thrust of the RSA was to compensate ETG for

fulfilling a duty it had already performed—launching a relationship between Borealis and its

finder of capital, Miller Buckfire.  ECF No. 237 at 10.  Indeed, in negotiating the RSA, Borealis'

Toepfer wrote to ETG's Chen that he acknowledged "the doors [Chen] opened" for Borealis and

the need to "take introductions and proportional contributions to any success into consideration."

ECF No. 220-11 at 3.  Toepfer also recognized that the value of ETG's introduction to Miller

Buckfire ultimately would depend on the success of Miller Buckfire's capital raising efforts and

that the two entities' compensation should, therefore, be linked.  *See id.* at 2–3.

Additional evidence indicates that the parties did not intend the RSA to limit ETG's

compensation only to investments specifically arranged by Miller Buckfire.  When Chen emailed

Toepfer to propose the agreement that would ultimately result in the RSA, he described his

proposal as an arrangement for ETG to share in "distributions . . . received by B[orealis], relating

to investments capitalized by Financings arranged *or* introduced by MB."  ECF No. 65-4 at 4

(emphasis added).  Consistent with that proposal, Chen has testified that the parties intended for

the RSA to "entitle[] [ETG] to a share in the carried interest resulting from activities stemming

from introductions made by Miller Buckfire to Borealis." Chen Dep. at 18:14–18; *see also id.* at 120:7–10, 122:15–20, 125:23–126:10. That view was reflected in an early draft of the RSA that Borealis' Toepfer sent to Chen in July 2012, which provided that, "[i]n the event Borealis raises any capital . . . *through the introduction of MB*, and such raising of capital results in MB receiving payment under their engagement letter [*i.e.*, the CRA], . . . Borealis will grant ETG a participation of 7.5% in the carry that Borealis . . . will receive from the capital invested." ECF No. 220-13 at 2 (emphasis added). The draft did not require ETG or Miller Buckfire to specifically arrange an investment in order for the transaction to trigger ETG's entitlement to carried interest, and the version the parties ultimately executed contained similar language: "In the event Borealis obtains Financing (as defined in the [CRA]), Borealis will grant ETG . . . a 7.5% interest in the carried interest of Borealis . . . in investment(s) . . . made with the Financing." RSA ¶ (c). Neither that provision, nor the definition of "Financing" in the CRA, contained an express requirement that ETG or Miller Buckfire arrange a transaction by a third-party investor for it to qualify as a "Financing." According to Chen, this correctly reflected the parties' intent: to compensate ETG based on "financing that was provided by a relationship that Miller Buckfire created for Borealis, in which Borealis had no [prior] relationship." Chen Dep. at 125:8–12.

In light of the foregoing evidence, Borealis cannot claim that the case is "so one-sided" that no reasonable juror could view the RSA as ETG does, nor that ETG has failed "to point to any relevant extrinsic evidence supporting [its] interpretation" of the parties' agreement. *Phoenix Ins.*, 2023 WL 5048629, at *11 (citation omitted).

3.    Application of ETG's Interpretation to EM II and EM III

Because ETG's construction of the RSA is reasonable, lawful, and supported by extrinsic evidence, the next question is whether a jury could find that EM II and EM III fall outside of the agreement, even assuming ETG's interpretation is correct.  As stated, under ETG's view of the RSA, an investment qualifies as a "Financing" if the transaction results and flows directly from an introduction made by Miller Buckfire.  *See* ECF No. 237 at 13.  Viewing the evidence in the light most favorable to ETG, a reasonable juror could conclude that both EM II and EM III meet that standard.

Substantial evidence supports the conclusion that EM II and EM III were merely individual portions of a broader joint venture that Borealis and KKR contemplated from the very beginning of the relationship that Miller Buckfire facilitated.  When Borealis' Toepfer was negotiating the CRA with Miller Buckfire, he wrote to ETG's Chen that Borealis was not ready for a large, $500 million investment of capital, but that Borealis might consider exploring "a two phase approach" that would entail "raising a smaller amount [of capital] first."  ECF No. 220-6 at 3.  After Borealis retained Miller Buckfire, the investment firm suggested the same approach, commenting on a Borealis draft investor presentation that Borealis should seek an "[i]nitial capitalization" of "$100 to $200 million," with the ultimate goal of reaching a "$500 million target."  ECF No. 220-10 at 17.

When Miller Buckfire introduced KKR to Borealis, KKR expressed an interest in partnering with Borealis on a "joint venture" and agreed that a phased approach to capitalization was appropriate.  *See* ECF No. 220-22 at 2; ECF No. 220-25 at 2.  Miller Buckfire told Borealis that KKR "was talking about a $100 to $150 [million] commitment level," but "that [KKR] could add to that later if appropriate."  ECF No. 220-25 at 2.  With Miller Buckfire's assistance,

Borealis and KKR ultimately launched what they described as a "joint venture company" called Embarcadero Maritime "to invest into the shipping markets."  Toepfer Dep. at 221:25–222:4; *see also* ECF No. 220-28.  The joint venture framework required Borealis to partner exclusively with KKR for at least five years and for KKR to make an initial $100 million capital commitment, with the option "to follow-on with additional capital" during the joint venture period "if opportunity warrants."  ECF No. 220-27 at 3.

Documentary evidence suggests that both parties expected KKR to make additional investments beyond the initial $100 million.  EM I was described as a "test run," Borealis 56.1 ¶ 15 (ETG response), and before the deal to complete EM I was even final, Borealis wrote that KKR was already "inten[ding] to deploy more USD 200 million of equity capital" to the joint venture, Toepfer Dep. at 220:25–221:4, 221:24–222:12, 222:20.  It is not surprising, then, that less than one year after EM I closed, Borealis- and KKR-associated entities closed EM II for another $100 million, bringing KKR's total contribution to the Embarcadero venture to $200 million.  ECF No. 218 at 6; *see also* ECF No. 84-9 at 2 (August 2014 email from Toepfer describing EM II as "[t]he next tranche of capital from KKR," suggesting that the various funds were viewed as tranches of a larger equity strategy); ECF No. 220-48 at 2 (July 2017 email from Toepfer noting that "[t]he carry of EM [I] and EM [II] are fully consolidated as if it was one fund").  The following year, EM III closed for another $200 million, bringing the total contribution to the Embarcadero Maritime venture to $400 million—all within the five-year joint-venture exclusivity period that Miller Buckfire helped Borealis arrange with KKR.  ECF No. 218 at 6; Toepfer Decl. ¶ 18.  This result was consistent with the original goal that Borealis had communicated to Miller Buckfire—to take an "initial capitalization" of $100 to $200 million and scale it up to something like $500 million—and Borealis ultimately described each of the

funds not as distinct investments or projects, but as "increased commitments" of equity by KKR to the original joint venture enterprise.  Toepfer Dep. at 47:2–4; *see* ECF No. 220-81.

In short, the evidence suggests that the EM funds were not independent ventures that should be viewed in isolation, but rather individual pieces of a broader equity strategy that Borealis had discussed with Miller Buckfire and later developed with KKR as a direct result of Miller Buckfire's introduction.  Further evidence indicates that Borealis believed ETG was entitled to a 7.5% share of the carry across the entire EM suite.  When Borealis and KKR were negotiating the terms of their joint venture in 2013, Toepfer told his KKR contact about the CRA with Miller Buckfire and the RSA with ETG, stating that "ETG will . . . receive 7.5% of [Borealis'] carry" generated by the joint venture:

> We were introduced to Miller[]Buckfire by an old contact of ours, Kimball Chen of [ETG].  Kimball participated in a few meetings with potential investors at the start.  As part of his introduction we agreed to a revenue sharing as per the attached. ETG will therefore receive 7.5% of our carry.

ECF No. 220-29.

After KKR expressed concern that these arrangements would hinder Borealis' growth, *see* ECF No. 220-33, KKR arranged for Borealis and Miller Buckfire to terminate the CRA in November 2013 in exchange for a $2 million payment from Borealis to Miller Buckfire, to be paid on an installment schedule aligned with the timing of KKR's capital commitments to the joint venture, *see* ECF No. 220-34, at 3–4.[6]  Around the same time, Toepfer wrote to Chen to

---

[6] The termination of the CRA did not impact the terms of the RSA.  As the Court previously stated, "a termination is not an amendment."  MTD Order at 5 n.2.  Borealis has pointed to no law indicating that parties may not define a term in one agreement by referencing a defined term in a separate, later-terminated agreement.  Ultimately, the CRA's termination left unaltered that agreement's definition of "Financing," incorporated by reference in ¶ (c) of the RSA.  There is no indication that Borealis informed ETG that it had agreed to terminate the CRA as the RSA required it to do, suggesting that Borealis did not believe the termination impacted the terms of the RSA.  *See* RSA ¶ (d) ("Borealis and ETG will inform each other promptly if any changes are made to the underlying agreements, or if any further agreements are signed relating to the work between Borealis and MB.").  In fact, the record reflects that both Toepfer and Chen understood the RSA to remain in effect long after the CRA was terminated in November

inquire whether ETG would be willing to modify the RSA on terms more favorable to Borealis. ECF No. 220-35 at 5–6.  Among other changes, Toepfer proposed limiting ETG's entitlement to carried interest to just the carry generated on the "initial equity commitments" of KKR, referring to the $100 million invested through EM I.  *Id.* at 4.  By framing that proposal as a change to the RSA, Toepfer appeared to recognize that capping ETG's entitlement to the carried interest generated only by EM I would depart from the original terms of the RSA.  *Id.* at 3–4 (email from Toepfer stating that the proposal to limit ETG's share of carry "to the current $100mil in KKR equity commitments" would be "largely . . . as per [the RSA], however, with . . . a cap based on initial equity commitments").  In other words, Toepfer knew that if the RSA were not modified, it would encompass the future tranches of KKR joint venture funding beyond the first $100 million.  *Accord id.* at 4 (email from Chen to Toepfer stating, "You seem . . . to be simply floating the possibility that we might voluntarily take less than the carry percentage to which we are contractually entitled.").  Ultimately, the parties never agreed to modify the RSA, which remains today as it was when they first executed it.

Viewing all the evidence in the light most favorable to ETG, a reasonable juror could conclude that EM II and EM III were part of a broader venture that was contemplated at the outset of, and flowed directly from, Miller Buckfire's introduction of KKR and Borealis.  It is, therefore, genuinely disputed whether each EM fund was a "Financing" under the RSA.

Accordingly, Borealis' motion for summary judgment with respect to EM II and EM III is denied.

---

2013.  *See, e.g.*, Chen Dep. at 80:21–86:17 (testifying as to 2018 emails between Toepfer and Chen regarding a proposed addendum to the RSA).

> D. The Stanley Maritime Funds

Borealis also contends that it is entitled to summary judgment with respect to SM I and SM II. *See* ECF No. 225 at 22–23. In accordance with the Protective Order, the parties have not taken discovery on either fund. As Judge Willis wrote in the Reconsideration Order, the Protective Order prohibits discovery with respect to SM I and SM II until "after a . . . ruling that the scope of the RSA could cover such funds." Reconsideration Order at 5 (alteration adopted) (emphasis omitted).

This Order constitutes such a ruling. As stated above, it is genuinely disputed whether the RSA entitles ETG to a portion of Borealis' carried interest generated from investments that result and flow directly from Miller Buckfire's introduction, including EM II and EM III. Although SM I and SM II were closed after the EM funds, a factfinder could conclude that they fall within the scope of the RSA if ETG establishes a proximate connection between Miller Buckfire's introduction of KKR and Borealis, and the funds' development.

ETG could establish such a connection. The limited evidence that ETG has received regarding the SM funds suggests that KKR and Borealis discussed the idea for a debt fund as early as March 2013, shortly after they were introduced by Miller Buckfire, and their follow-up conversations regarding the idea continued throughout the Embarcadero Maritime joint venture period. ECF No. 220-21 at 2 (January 2013 email from Miller Buckfire to Toepfer noting that Toepfer had an idea for a "debt fund"); ECF No. 220-83 (March 2013 email from Toepfer to KKR stating, "if we are putting a [joint venture] together with [you], such project [a 'debt fund'] would fall in to the basket of opportunities we would like to look at together with you as well"); ECF No. 220-85 (March 2013 response from KKR affirming that Toepfer's idea was "very interesting and could be something we look at doing together through a separate pool of

capital"); ECF No. 220-49 at 2 (2017 email from Toepfer describing the "debt fund" as the "next project" KKR wanted to launch with Borealis).  Because the RSA's definition of "Financing" could conceivably reach the SM funds, ETG should be permitted to take discovery on that issue.

Borealis' motion for summary judgment with respect to the SM I and SM II funds is, therefore, denied without prejudice to renewal within fourteen days after the close of reopened fact discovery.[7]

## II.    Motions to Seal

### A.  Legal Standard

The public enjoys a "general right to inspect and copy public records and documents, including judicial records and documents."  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  This presumption of public access "is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)).  When a party moves to seal documents, it "bears the burden of showing that higher values overcome the presumption of public access." *Samsung Elecs. Co., Ltd. v. Microchip Tech. Inc.*, No. 24 Misc. 269, 2024 WL 4169353, at *2 (S.D.N.Y. Sept. 12, 2024) (quoting *Kewazinga Corp. v. Google LLC*, No. 20 Civ. 1106, 2024 WL 3442428, at *1 (S.D.N.Y. July 17, 2024)).

Courts conduct a three-step analysis.  First, a court determines whether the relevant material constitutes a "judicial document," *i.e.*, a document that is "relevant to the performance of the judicial function and useful in the judicial process."  *Lugosch*, 435 F.3d at 119 (quoting

---

[7] Because the Court has directed fact discovery to proceed on additional funds, including the Stanley Maritime funds, the Protective Order's stay of that discovery is vacated.  *See* Protective Order at 15; Reconsideration Order at 4–5.  ETG's objections to the Protective Order and Reconsideration Order are, therefore, overruled as moot.  *See* ECF Nos. 138, 157.

*United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)).  The relevance of a document does not depend on "which way the court ultimately rules or whether the document ultimately in fact influences the court's decision," but rather on whether the document "would reasonably have the *tendency* to influence a district court's ruling on a motion."  *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) (emphasis in original).

If material constitutes a "judicial document," the "common law presumption of access attaches," and a court must evaluate the "weight of that presumption."  *Lugosch*, 435 F.3d at 119. "[T]he presumption of public access is at its highest when the material is relevant to a court's decision on a dispositive motion."  *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2022 WL 329211, at *1 (S.D.N.Y. Feb. 3, 2022).  The presumption is "weaker where the 'documents play only a negligible role in the performance of Article III duties.'"  *Olson v. Major League Baseball*, 29 F.4th 59, 89 (2d Cir. 2022) (quoting *Amodeo*, 71 F.3d at 1050).

A court must balance the weight of the presumption against "competing considerations," including "the privacy interests of those resisting disclosure."  *Lugosch*, 435 F.3d at 120 (quoting *Amodeo*, 71 F.3d at 1050).  Such privacy interests may include protecting against the disclosure of "sensitive, confidential, or proprietary business information," *Ripple*, 2022 WL 329211, at *1, or private settlement communications, *see Lieu v. Nielsen Co. (US) LLC*, No. 22 Civ. 9084, 2023 WL 3750116, at *2 (S.D.N.Y. June 1, 2023).  "[B]argained-for confidentiality" through vehicles like protective orders will not, however, overcome the presumption of public access.  *Bernsten v. O'Reilly*, 307 F. Supp. 3d 161, 168 (S.D.N.Y. 2018).

Ultimately, sealing judicial documents "may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim."  *Lugosch*, 435 F.3d at 124.

25

### B.  Application

Borealis and Miller Buckfire each seek leave to file various documents under seal.  ECF Nos. 206, 223, 243, 251, 254.  Because the documents were submitted in connection with the parties' cross-motions for summary judgment, they "are—as a matter of law—judicial documents."  *Lugosch*, 435 F.3d at 121; *see also Brown*, 929 F.3d at 48 (denial of motion for summary judgment does not abrogate judicial document status even where documents were not relied upon in ruling).  Accordingly, for each sealing request, the Court focuses on (1) the weight accorded the presumption of public access, and (2) whether Borealis or Miller Buckfire has met its burden to overcome that presumption by showing that the nonpublic filing is narrowly tailored to promote higher interests.

### 1.  2013 Renegotiation Materials

The first category of material Borealis seeks to file under seal relates to Toepfer's 2013 efforts to renegotiate the terms of the RSA with Chen.  Borealis contends that the material should be sealed because it constitutes settlement communications.  *See, e.g.*, ECF No. 206 at 1.  ETG disagrees, arguing that the 2013 material shows only that Borealis made a "direct attempt to renegotiate" the RSA shortly after it first received "Financing" from KKR, "not to settle a claim" with ETG.  ECF No. 212 at 1; *see id.* at 2–3.  The Court agrees with ETG.

Federal Rule of Evidence 408 serves as a helpful guide for evaluating whether material constitutes settlement communications.  For Rule 408 to apply, the moving party must establish that the communications concern "an actual dispute, or at least an apparent difference of opinion between the parties[,] as to the validity of a claim."  *Alpex Comput. Corp. v. Nintendo Co., Ltd.*, 770 F. Supp. 161, 163 (S.D.N.Y. 1991).  Borealis has not shown that, in 2013, the parties disagreed as to the validity of ETG's entitlement to carried interest under the RSA.  As ETG

points out, "[t]here was no money to fight over" in 2013 because no carried interest on any "Financing" had been generated, and none would be generated for years to come, if at all. ECF No. 212 at 2. Chen and Toepfer's communications do not suggest that they disagreed regarding the scope or the meaning of the RSA, nor do they suggest that the parties anticipated a dispute of that nature at any point in the future. The communications make plain that Toepfer wished to revisit the RSA because he no longer believed the terms the parties originally agreed to were in Borealis' best interests, whereas Chen was happy to leave the RSA as it was. *See* ECF No. 220-35; *see also* Chen Decl. ¶ 21, ECF No. 122.

Toepfer and Chen may have disagreed about the best path forward for their respective businesses, but there is no suggestion that they were engaged in any actual or contemplated legal dispute and, therefore, no indication that the exhibits and testimony should be sealed as confidential settlement material. *See* ECF No. 236 at 2 ("By [Borealis'] standard, every negotiation that has ever occurred between two counterparties trying to arrive at a deal to modify a contract is a settlement negotiation."); *cf. L-3 Commc'ns Corp. v. OSI Sys., Inc.*, No. 02 Civ. 9144, 2006 WL 988143, at *5–6 (S.D.N.Y. Apr. 13, 2006) ("[T]he disputed testimony constitutes more of a counter-proposal made in the midst of a business communication than a settlement offer made in the course of compromise negotiations to settle a claim." (citation omitted)). Borealis' sealing requests at ECF Nos. 206, 223, 243, and 254 are, therefore, denied to the extent they encompass such material.

### 2.   Settlement Materials from October 7, 2018, and Onward

Other documents in the record should remain sealed as private settlement communications. The record reflects that a legal dispute emerged between Borealis and ETG when, on October 7, 2018, Toepfer wrote to Chen that "[i]t could . . . be argued" that ETG's

27

entitlement to compensation under the RSA is limited to just the carry generated on EM I—the same position Borealis now takes in this litigation.  ECF No. 122-15 at 2.  That argument, raised for the first time in Toepfer's October 2018 email to Chen, appears to have shifted the nature of the parties' conversations from business deal-making to a concrete dispute regarding ETG's entitlement to compensation derived from KKR-related investments beyond EM I.[8]  Chen insists that he never threatened Borealis with a lawsuit, Chen Decl. ¶ 34, but the possibility of litigation appears to have been contemplated by both sides beginning in October 2018, *see, e.g.*, ECF No. 122-25 at 2; ECF No. 122-26 at 2.  The evidence, therefore, establishes that from October 7, 2018, onward, there was "an apparent difference of opinion between the parties as to the validity of [ETG's] claim" to the carried interest that would be generated by funds such as EM II, EM III, SM I, and SM II.  *Alpex*, 770 F. Supp. at 163.

Material concerning settlement discussions between Borealis and ETG on and after October 7, 2018, may remain under seal.  *See SEC v. Telegram Grp. Inc.*, No. 19 Civ. 9439, 2020 WL 3264264, at *5 (S.D.N.Y. June 17, 2020) (finding that "confidentiality of the settlement negotiation process outweighs the public's presumption of access").  To the extent

---

[8] Toepfer suggests that the parties' legal dispute regarding the scope of the RSA first emerged at a meeting that took place in New York on January 10, 2018.  ECF No. 114 ¶¶ 3–4.  Chen recalls the meeting differently.  *See* Chen Decl. ¶¶ 23–26.  According to Chen, the parties discussed whether ETG would be open to revisiting the RSA to limit or cap its entitlement to a portion of Borealis' carry generated by KKR financing—that is, the same sort of conversation the parties had been having on and off since 2013. *Id.* ¶¶ 24–25.  Toepfer and Chen did not communicate again until September 2018, *see id.* ¶ 27, and their emails at that time do not reflect disagreement regarding the scope of the RSA as applied to EM II and EM III, *see* ECF Nos. 122-12 to -13.  Rather, they appear to summarize the meeting in January 2018 as resulting in an agreement in principle (never actually consummated) to modify the RSA to cut back—but not eliminate—ETG's carry on those funds.  *See* ECF Nos. 122-13 to -14.  There is no suggestion that the agreement in principle was the product of an effort to resolve a legal dispute.  Indeed, it was not until October 7, 2018, that Toepfer first stated his view that "it could . . . well be argued" that the RSA does not entitle ETG to any carry generated by EM II or EM III.  ECF No. 122-15 at 2.  Accordingly, the Court finds that Toepfer and Chen's communications first took on the character of settlement conversations no earlier than October 7, 2018.

material related to communications prior to October 7, 2018, has been filed under seal as settlement material, *see, e.g.*, Protective Order at 11, that material must be publicly filed.

### 3.   Commercially Sensitive Materials

#### a.   Miller Buckfire's Sealing Request

Miller Buckfire, through Borealis' counsel, moves to file under seal a contact log listing the investors Miller Buckfire contacted on Borealis' behalf, as well as one email from Miller Buckfire to Borealis in which Miller Buckfire advises Borealis on issues related to a potential investor. ECF No. 251; *see* ECF No. 220-20 (contact log); ECF No. 220-28 (email). ETG does not oppose the request, ECF No. 251 at 1, and the motion is granted. The Court agrees with Judge Willis that the weight of the presumption of public access is "modest" as to the contact log, because the document is only "tangentially related" to the underlying motions. Protective Order at 8. In addition, the contact log contains "names, email addresses, and phone numbers of various Miller Buckfire contacts at different financial institutions" that have no relevance to this action and would generally be considered private or sensitive. *Id.* at 9.

As for the email, the presumption of public access is stronger because it concerns efforts Miller Buckfire undertook to finalize an initial capital commitment for Borealis. *See* ECF No. 220-28. Nevertheless, the document is not critical to the Court's adjudication of the parties' cross-motions for summary judgment, and if it were filed publicly, it could damage Miller Buckfire's relationship with business partners. Accordingly, the unredacted versions of the contact log and email may remain under seal, and Miller Buckfire's proposed redactions are approved for public filing.

### b. Agreement Between Borealis and a Third Party

Borealis moves to seal exhibits, testimony, and briefing touching on an agreement between Borealis and a third party. *See* ECF No. 223 at 2–4; ECF No. 254 at 2–4. ETG takes no position on the requests, though it notes its disagreement "with the breadth of, and rationale for, Borealis' proposed redactions." ECF No. 257 at 3.

Borealis argues that the material at issue has "no bearing on" the parties' cross-motions for summary judgment, ECF No. 223 at 2, a fact that is belied by ETG's reliance on the documents in its briefing, *see, e.g.*, ECF No. 237 at 16–17. Borealis also suggests that the material is "commercially sensitive" and constitutes "confidential and proprietary business information." ECF No. 254 at 3–4 (citation omitted). It does not explain, however, what makes the material sensitive, confidential, or proprietary. Borealis further argues that disclosure of "deal terms with third-parties would be advantageous to Borealis' competitors and could harm Borealis' ability to effectively negotiate with potential business partners in the future," but the redactions it proposes go far beyond the narrow terms of its dealings with the third party. *Id.* at 4. Accordingly, Borealis fails to show that sealing the material is "necessary to preserve higher values" that overcome the presumption of public access, or that its requests are "narrowly tailored to achieve that aim." *Lugosch*, 435 F.3d at 124. To the extent Borealis' motions at ECF Nos. 223 and 254 apply to the "contract between Borealis and a third party," the motions are denied without prejudice to renewal by the date specified below. ECF No. 223 at 2; ECF No. 254 at 3.

### c. Remaining Materials

The remainder of Borealis' requests concern seal material that it has deemed "commercially sensitive," "proprietary," or "confidential." *See* ECF Nos. 223, 254. These

requests are expansive, covering dozens of pages of exhibits, declarations, deposition testimony, and briefing—including some documents in their entirety.  Borealis claims that the proposed redactions are "narrowly tailored," ECF No. 223 at 3; ECF No. 254 at 4, but it does not explain what efforts it has undertaken to narrow its requests, and the sheer scope of the proposed redactions belies the contention.  The requests cover an extraordinarily broad range of materials—from those concerning exit fees on Embarcadero Maritime funds, to various negotiations between Borealis and KKR and Borealis and Miller Buckfire, to the dozens of pages of the EM limited liability agreements, to the EM joint venture terms, and much more, including material that has been publicly available on the docket since June 2023.  *See* ECF No. 254 at 2–3; ECF No. 65.

Borealis has failed to explain why any of the distinct topics of material it seeks to seal should be withheld from public view.  Instead, it has grouped the materials into just three generalized categories: "highly confidential commercially sensitive information," "monetary figures pertaining to Borealis's non-public business dealings," and "confidential and proprietary deal terms."  ECF No. 223 at 2; ECF No. 254 at 2–3.  To justify sealing all of the diverse material that falls within these categories, Borealis claims that each category comprises material that is either "sensitive," "confidential," or would harm Borealis' interests if disclosed, without providing further detail.  *See, e.g.*, ECF No. 223 at 2–4; ECF No. 254 at 2–3.  "Such conclusory assertions do not justify placing a judicial document under seal."  *Ashour v. Ariz. Beverages USA LLC*, No. 19 Civ. 7081, 2025 WL 961682, at *12 (S.D.N.Y. Mar. 28, 2025).  Borealis does not "offer any specific information about why disclosing these documents would affect [its] competitiveness," for example, "nor does the Court view most of the[] [material] as containing sensitive business information."  *Id.*

31

In addition, Borealis fails to explain the weight of the presumption of public access the Court should accord the various groups of documents that make up its three broad categories. Borealis makes the sweeping contention that the public has little interest in "commercially sensitive information" irrespective of the role the information plays in a public proceeding. ECF No. 254 at 4. Not so. As courts in this District have long explained, the fact that material constitutes a nonpublic business agreement, business negotiation, or monetary figure does not necessarily mean that private interests outweigh the public's right of access. *See McKoy v. Trump Corp.*, No. 18 Civ. 9936, 2023 WL 7924685, at *3 (S.D.N.Y. Nov. 16, 2023) ("The fact that parties to a contract deem that contract confidential does not, in and of itself, rebut a presumption of public access."); *Bernsten*, 307 F. Supp. 3d at 168 ("Courts in this District have long held that bargained-for confidentiality does not overcome the presumption of access to judicial documents."). Moreover, as the Court's decision today makes clear, not all of the material that Borealis seeks to file under seal is irrelevant to the merits of the parties' dispute. *See Olson*, 29 F.4th at 89 (citation omitted) (explaining that the weight of the presumption shifts depending on the role the documents play "in the performance of Article III duties").

Because Borealis fails to apply the correct legal standard to the unique circumstances of each category of material it seeks to file under seal, and because its proposed redactions are not narrowly tailored, Borealis has not met its burden to demonstrate that most of its so-called "commercially sensitive," "proprietary," or "confidential" material should be filed under seal. Its remaining sealing requests are, therefore, denied without prejudice to renewal.

To summarize:

1.  Communications predating October 7, 2018, that Borealis previously claimed to be settlement communications, as well as any and all material concerning those communications, that has been filed under seal in this matter must be filed on the public docket, without redactions, except to whatever extent the

material also falls into any of the categories below, no later than one month after the date of this Order.

2. Communications dated on or after October 7, 2018, that Borealis has previously claimed to be settlement communications, as well as any and all material concerning those communications, shall remain under seal.

3. Any and all copies of the contact log and email referenced in Miller Buckfire's unopposed sealing request at ECF No. 251 shall remain filed under seal.

4. As to the remainder of the material referenced in Borealis' sealing requests at ECF Nos. 206, 223, 243, and 254, by **August 1, 2025**, Borealis shall propose revised, narrowly tailored redactions consistent with this Order.[9] Its accompanying motion to seal shall justify the proposed redactions based on the needs specific to each redaction. All material to be sealed must be identified by reference to the material's CM/ECF docket number. Borealis may utilize tables, graphs, or spreadsheets to assist in organizing its renewed sealing request. Borealis is advised, however, that the Court views the vast majority of the summary judgment record as appropriate for the public docket.

## CONCLUSION

For the foregoing reasons, ETG's motion for partial summary judgment, ECF No. 216, is GRANTED; Borealis' motion for summary judgment, ECF No. 224, is DENIED, without prejudice to renewal as to SM I and SM II within fourteen days of the close of reopened fact discovery; ETG's Rule 72(a) objections, ECF Nos. 138, 157, are OVERRULED AS MOOT; Borealis' letter motions to seal, ECF Nos. 206, 223, 243, 254, are GRANTED IN PART and DENIED IN PART; and Miller Buckfire's letter motion to seal, ECF No. 251, is GRANTED.

---

[9] The Court's Order narrowly redacts certain material covered by Borealis' sealing requests—specifically, the amounts invested in the Embarcadero funds beyond EM I and one provision of the Borealis-KKR joint venture. *See supra.* In the event Borealis does not timely renew its sealing motion or justify why this information should remain sealed, the Court shall refile its order on the public docket without redactions.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 216, 223, 224, 243, 251, and 254.

SO ORDERED.

Dated:  July 8, 2025August 7, 2025
        New York, New York

ANALISA TORRES
United States District Judge